[Cite as *State v. Walker*, 2016-Ohio-3185.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 14AP-905 |
| | | (C.P.C. No. 13CR-1744) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Samuel Walker Jr., | : | |
| Defendant-Appellant. | : | |

---

D E C I S I O N

Rendered on May 26, 2016

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Laura R. Swisher*, for appellee.

**On brief:** *Siewert & Gjostein Co. LPA*, and *Thomas A. Gjostein*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Samuel Walker Jr., from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which he was found guilty of possession of cocaine, with a firearm specification.

{¶ 2} On March 29, 2013, appellant was indicted on one count of possession of cocaine, in violation of R.C. 2925.11, and two firearm specifications. The first firearm specification charged a violation of R.C. 2941.144 (i.e., that the offender had an automatic firearm or a firearm with a muffler or silencer), while the second specification charged a violation of R.C. 2941.141 (i.e., that the offender had a firearm on or about his person or under his control at the time he possessed cocaine).

{¶ 3}   On May 23, 2014, appellant filed a motion to suppress which plaintiff-appellee, State of Ohio, opposed by memorandum contra.  On August 12, 2014, the trial court conducted a hearing on the motion to suppress.  At the suppression hearing, the state presented the testimony of Columbus Police Officer James Wells and Whitehall Police Sergeant Randall Snider, and appellant testified on his own behalf.  Following the presentation of evidence, the trial court denied appellant's motion to suppress.

{¶ 4}   On August 13, 2014, the matter came for trial before a jury.  The first witness for the state was Whitehall Police Officer Gary Baker.  On February 11, 2013, Officer Baker was on patrol, driving northbound on Yearling Road, when "two younger females * * * flagged [him] down in the middle of the road."  (Tr. Vol. I, 114.)  The females advised the officer "they just had been shot at by two known males."  (Tr. Vol. I, 115.)  The shooting purportedly occurred at the intersection of Hamilton Road and East Livingston Avenue.  Officer Baker learned that the alleged shooter, Fred Brady, "was the boyfriend of one of the females," and that "there was another known male, Samuel Walker, that was the driver of the vehicle."  (Tr. Vol. I, 115.)  Officer Baker provided police radio dispatchers with that information, and police obtained further information that appellant resided at the Andrus Apartments in Whitehall.  A short time later, an officer observed a vehicle arrive at that apartment complex.

{¶ 5}   On the afternoon of February 11, 2013, Officer Wells received a radio dispatch advising that a female had reported "her boyfriend was firing at her in the area of * * * Livingston and Yearling."  (Tr. Vol. I, 120.)  Officer Wells responded to the dispatch, and drove to the "area where the suspect was supposed to be traveling to."  (Tr. Vol I, 122.)  Officer Wells met Sergeant Snider near an apartment located at 3973 Andrus Avenue, Whitehall.  At that time, "two individuals were exiting the apartment, going towards the vehicle."  (Tr. Vol I, 122.)  The officers "had the boyfriend's name, * * * Fred Brady," and they were "trying to identify" which individual was Brady.  (Tr. Vol I, 123.)

{¶ 6}   The officers approached the two men and secured them, placing one of the men (Brady) inside a cruiser, while the other individual (appellant) remained outside the cruiser in handcuffs.  After determining the identity of Brady, the officers removed appellant's handcuffs.  Appellant verified his apartment number with the officers, and Officer Wells asked appellant if Brady had left a handgun in the apartment; appellant

responded: "No, not at all." (Tr. Vol. I, 125.) Officer Wells then asked appellant: "Can we verify that? Do you mind?" (Tr. Vol. I, 125.) Appellant stated: "Absolutely. Because he didn't shoot at his girlfriend. You can look." (Tr. Vol. I, 125.)

{¶ 7} Officer Wells testified that appellant "walked us up to the door and * * * he opened the door for us." (Tr. Vol. I, 125.) As soon as the officers stepped inside the apartment, Officer Wells informed appellant he had "the right to revoke," that he could "rescind [his] consent at any time." (Tr. Vol. I, 126.) Appellant responded: "There's no gun in here. Mr. Brady did not leave any gun in here. You can look. There's no gun. It's fine." (Tr. Vol. I, 126.)

{¶ 8} Inside the apartment, Officer Wells pushed on a door that was "partially ajar," leading to "a bathroom." (Tr. Vol. I, 127.) The officer observed "in plain view * * * what appeared to be [a] plastic baggie containing heroin and a plastic baggie containing crack cocaine." (Tr. Vol. I, 127.) Officer Wells then noticed a closet on the first floor and asked appellant: "Is there anybody in the closet that can harm us? Anybody in there?" (Tr. Vol. I, 128.) Appellant responded: "Of course not." (Tr. Vol. I, 128.) The officer observed a "tall gun safe, about four, five feet tall," inside the closet. (Tr. Vol. I, 128.) Officer Wells asked appellant if there was a weapon in the safe, and appellant responded: "Yeah. There's an AK." (Tr. Vol. I, 129.) The officer made a request to see the weapon, and appellant "opened the gun safe." (Tr. Vol. I, 129.) The officer observed an AK-47, as well as a "high-capacity magazine for the AK." (Tr. Vol. I, 129-30.)

{¶ 9} Officer Wells observed the stairway leading to the second floor, and he asked appellant if there was anyone upstairs. Appellant responded: "No, nobody's here." (Tr. Vol. I, 130.) The officer again advised appellant that he could rescind his consent at any time. Officer Wells then asked appellant if the officers could go upstairs. At that time, appellant told the officer he wished to rescind his consent. Officer Wells and the other police personnel then exited the residence with appellant.

{¶ 10} On the date of the incident, Sergeant Snider was dispatched to 3973 Andrus Avenue, Whitehall. Two other police officers, including Officer Wells, were already at the location investigating a vehicle reported to have been involved in an earlier shooting incident. The officers had secured a suspect, identified as Brady, in the backseat of a police cruiser, while another individual, identified as appellant, was at the apartment.

{¶ 11} Sergeant Snider asked appellant if the officers could enter the apartment. Appellant "allowed us to enter the apartment and to search." (Tr. Vol. I, 158.) Sergeant Snider observed a gun safe inside the apartment. Appellant told Sergeant Snider that the safe was unlocked and that the sergeant could open it. Sergeant Snider requested that appellant open the safe himself, which he did. Sergeant Snider observed an assault rifle and a "drum magazine." (Tr. Vol. I, 158.) Appellant told Sergeant Snider that the magazine held 75 rounds of ammunition.

{¶ 12} When the officers subsequently inquired about going upstairs, appellant revoked his consent to continue the search. The officers and appellant then went outside. Sergeant Snider asked appellant if he would be willing to sign a "Consent to Search form," acknowledging that "he had allowed us to search his apartment." (Tr. Vol. I, 159.) Sergeant Snider "explained to him what he would be signing," reflecting "the fact that he did give us verbal consent to enter into the residence to search." (Tr. Vol. I, 161.) Appellant "signed the form." (Tr. Vol. I, 161.) At trial, the state introduced the "Consent to Search Without a Warrant form" containing appellant's signature. (Tr. Vol. I, 138.)

{¶ 13} On February 11, 2013, Whitehall Police Detective John Earl was dispatched to 3973 Andrus Avenue, where he spoke with officers at the scene and determined there was sufficient information to apply for a search warrant. Later that evening, a judicial officer of the Franklin County Municipal Court signed the search warrant, and Detective Earl returned to appellant's residence with several other detectives and executed the warrant. At trial, Detective Earl identified photographs taken of the apartment during the search. In the northwest upstairs bedroom, identified as "Fred Brady's room," the detectives discovered a loaded 9 mm "Walther handgun beside the bed." (Tr. Vol. I, 200.) Detectives also found a digital scale in that room. The detectives found mail addressed to Brady on the nightstand of that bedroom, as well as a driver's license belonging to Brady. Detective Earl identified a photograph of heroin and crack cocaine found in the bathroom on the first floor. Brady informed police that "the drugs that were recovered in the bathroom were his." (Tr. Vol. II, 306.)

{¶ 14} Appellant informed Detective Earl that the "northeast bedroom" on the second floor was his bedroom. (Tr. Vol. II, 234.) In the room identified as appellant's bedroom, detectives found "individual baggies of suspected cocaine" in a dresser drawer,

as well as a loaded Smith & Wesson .40-caliber handgun. (Tr. Vol. II, 237.) The dresser also contained a small digital scale, and empty individual baggies. The detectives found mail on the dresser drawer "showing Mr. Walker's name," and addressed to "3973 Andrus." (Tr. Vol. II, 235.)

{¶ 15} Based on items the detectives found in the apartment during the search, police arrested appellant and gave him Miranda warnings. Police detectives questioned him about the items recovered from the apartment, including cocaine found in the bedroom identified as his bedroom. Appellant denied any knowledge of the digital scales and the Smith & Wesson handgun. Appellant told Detective Earl that "he thought * * * Mr. Brady had left those items in his bedroom and forgot about them." (Tr. Vol. II, 252.) Appellant told the detective that the AK-47 rifle belonged to him, as well as the high capacity drum magazine. Appellant confirmed that the northeast bedroom of the apartment "was his" bedroom. (Tr. Vol. II, 253.)

{¶ 16} Andrew McClelland, an employee of the Ohio Bureau of Criminal Identification and Investigation ("BCI"), performed a firearm test of the state's exhibit No. 13, the .40-caliber Smith & Wesson handgun. McClelland testified that the weapon "functioned as intended." (Tr. Vol. II, 322.) He also performed an operability test on the AK-47 rifle, and it tested as operable.

{¶ 17} Jessica Toms, a forensic scientist with BCI, performed testing on the substance (state's exhibit No. 3) found in the dresser of the upstairs northeast bedroom identified as appellant's bedroom. Toms testified that the substance tested positive for cocaine, a schedule II controlled substance.

{¶ 18} The first witness to testify on behalf of appellant was Dominique Walker, appellant's son. In March 2010, appellant and Dominique, age 23, moved into the apartment at 3973 Andrus Avenue following the break-up of appellant's relationship with Dominique's stepmother, Shonda Walker. Dominique, who moved out of the Andrus Avenue apartment on October 26, 2012, testified that the relationship between appellant and Shonda, who had her own residence in Reynoldsburg, gradually improved to the point that appellant and Shonda "were together every day." (Tr. Vol. II, 443.) Dominique testified that his father was doing more things at Shonda's residence "around December 2012." (Tr. Vol. II, 4445.)

{¶ 19} Shonda also testified on behalf of appellant. Shonda and appellant were married in April 2006 and separated in November 2012. At the time of the separation, Shonda resided at a house on Chatford Drive in Columbus, while appellant moved to the residence on Andrus Avenue. By December 2012, Shonda and appellant were seeing each other again; Shonda saw appellant "[b]asically every day" during this time. (Tr. Vol. II, 460.) Appellant began spending nights at Shonda's residence on Chatford Drive, and he kept clothes and other personal items at her residence. By February 2013, appellant was spending every day at the Chatford Drive residence. Shonda was familiar with Brady, appellant's nephew. Appellant's sister had phoned appellant and told him that Brady "wasn't on the right track," and she asked appellant "if it was possible that he could come stay with him." (Tr. Vol. III, 489.) On cross-examination, Shonda testified that appellant had a permit to carry a concealed weapon, and that he had purchased a "smaller size gun." (Tr. Vol. III, 499.)

{¶ 20} Marshall Cobb, a friend of appellant, testified that he moved into the basement of appellant's residence at 3973 Andrus Avenue in May 2012; Cobb had asked to move in with appellant because he did not have a place to stay. Brady moved into the residence the last week of January 2013. According to Cobb, appellant did not feel comfortable with Brady living there "because he knew Mr. Brady sold drugs." (Tr. Vol. III, 530.) Cobb was also concerned about Brady's conduct at the apartment.

{¶ 21} Following the presentation of evidence, the jury returned a verdict finding appellant guilty of possession of drugs; the jury also found appellant guilty of the attendant one-year firearm specification under R.C. 2941.141, but not guilty of the three-year firearm specification under R.C. 2941.144. The trial court sentenced appellant by judgment entry filed on September 29, 2014.

{¶ 22} On appeal, appellant sets forth the following four assignments of error for this court's review:

> FIRST ASSIGNMENT OF ERROR
>
> THE TRIAL COURT ERRED IN DENYING THE APPELLANT'S MOTION TO SUPPRESS THE SEARCH IN THAT APPELLANT DID NOT CONSENT PRIOR TO THE SEARCH AND, FURTHER, ANY CONSENT FORM WAS EXECUTED AT THE POLICE STATION UNDER

MISREPRESENTATION AND DECEPTION IN VIOLATION OF HIS RIGHTS TO THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND [ARTICLE] I, SECTION 14 OF THE OHIO CONSTITUTION.

SECOND ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED IN NOT INSTRUCTING THE JURY ON THE FIREARM SPECIFICATION FOR §2941.141 FOR A FIREARM ON OR ABOUT THE PERSON OR UNDER HIS CONTROL PURSUANT TO THE OHIO JURY INSTRUCTIONS (OJI), §425.17 AND CAUSED PLAIN ERROR IN AFFECTING A SUBSTANTIAL RIGHT OF THE APPELLANT, THOUGH NOT BROUGHT TO THE ATTENTION OF THE COURT.

THIRD ASSIGNMENT OF ERROR

THE CLOSING ARGUMENT OF THE APPELLANT UNDERMINED THE APPELLANT'S FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS, AS WELL AS HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE REPRESENTATION OF COUNSEL.

FOURTH ASSIGNMENT OF ERROR

APPELLANT'S CONVICTION WAS NOT SUPPORTED BY THE SUFFICIENCY OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1 & 16 OF THE OHIO CONSTITUTION AND THE CONVICTION WAS ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 23} Under the first assignment of error, appellant argues the trial court erred in denying his motion to suppress the search of his residence, asserting that the circumstances surrounding his signature on the consent to search form are suspect. Specifically, appellant cites testimony by Sergeant Snider stating that appellant signed the form immediately after revoking his earlier oral consent to search the first floor of the residence. Appellant maintains he had no idea what he was signing, and that Sergeant Snider could not have made him aware of the contents of the consent form prior to

signing it. Appellant also contends there were inconsistencies between the testimony of Officer Wells and Sergeant Snider. Finally, appellant challenges the credibility of Sergeant Snider's explanation as to why he did not execute the consent to search form prior to the search.

{¶ 24} An appellate court's review of a trial court's ruling on a motion to suppress "presents a mixed question of law and fact." *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. The trial court, in considering a motion to suppress, "assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.* A reviewing court therefore must "accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.* Further, "[a]ccepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*

{¶ 25} The Fourth Amendment to the United States Constitution affords protection to individuals against unreasonable searches and seizures by the government. *State v. Brentlinger,* 3d Dist. No. 13-04-10, 2004-Ohio-4529, ¶ 18. Absent a search warrant, "a search is per se unreasonable unless it falls under a few established exceptions." *State v. Swetnam,* 5th Dist. No. 14-CA-57, 2015-Ohio-1003, ¶ 14. Once a defendant shows a search was warrantless, "the burden shifts to the state to show it was permissible under one of the exceptions." *Id.* One exception to the warrant requirement is consent, and a warrantless search based on consent is valid if the consent is voluntarily given. *Brentlinger* at ¶ 19.

{¶ 26} We begin with a review of the testimony presented at the suppression hearing regarding the initial search by police officers of the first floor area of appellant's apartment on the afternoon of February 11, 2013. On that date, at approximately 4:30 p.m., Officer Wells was dispatched to 3973 Andrus Avenue, Whitehall, after receiving a report of shots allegedly fired from a vehicle by a named individual (Brady). Upon arriving at the apartment complex, Officer Wells observed appellant and Brady exiting the apartment. After securing Brady, "the known suspect," in the back of a cruiser, the officers spoke with appellant. (Tr. Vol. I, 15.)

{¶ 27} Officer Wells testified that appellant informed the officers that the apartment "was his." (Tr. Vol. I, 15.) Officer Wells expressed concern to appellant that "since Mr. Brady is the known suspect who was allegedly firing shots at his girlfriend * * * a firearm may be in play." (Tr. Vol. I, 15-16.) Appellant assured the officer "that there was no firearm involved," and that there was "nothing in his apartment." (Tr. Vol. I, 16.) Officer Wells asked appellant if the officers could look inside the apartment; according to Officer Wells, appellant "said it was fine. He said because Mr. Brady did not have a firearm * * * [t]here's nothing in there. He said you're more than welcome to look. There's nothing there for you to see." (Tr. Vol. I, 16.)

{¶ 28} Appellant "opened the door" and "we walked in." (Tr. Vol. I, 17.) As the officer and appellant stepped inside the apartment, Officer Wells "advised him * * * we're just looking for a firearm. (Tr. Vol. I, 17.) The officer told appellant: "[I]t's totally with your consent." (Tr. Vol. I, 17.) The officer informed appellant he could "withdraw [his] consent" and "rescind it any time [he] want[ed]." (Tr. Vol. I, 17.) Officer Wells asked appellant if he understood, and appellant "said yes." (Tr. Vol. I, 17.) Officer Wells further testified that, prior to entering the apartment, appellant gave "[c]lear consent multiple times, along with opening the door." (Tr. Vol. I, 28.)

{¶ 29} Inside the apartment, the first door on the left led to a bathroom; Officer Wells pushed the door open and "in plain view" observed "what I knew to be crack cocaine and heroin contained in a plastic baggie." (Tr. Vol. I, 18.) The officer then observed a closet in the first floor living room area; inside the closet was "a tall, heavy gun safe." (Tr. Vol. I, 21-22.) Officer Wells asked appellant what was inside the safe, and appellant responded: "A gun." (Tr. Vol. I, 22.) The officer requested to see the weapon, and appellant said "Sure." (Tr. Vol. I, 23.) Appellant opened the safe for the officers, and Officer Wells observed an AK-47 and a drum magazine.

{¶ 30} As the officers returned to the front door area, Officer Wells observed "steps leading upstairs." (Tr. Vol. I, 25.) He inquired if there was anyone upstairs, and appellant responded: "Nobody's home." (Tr. Vol. I, 25.) Officer Wells asked appellant: "Do you mind if we look upstairs?" (Tr. Vol. I, 25.) Appellant then asked the officer: "You stated I can rescind my consent at any time, correct?" (Tr. Vol. I, 25.) Officer Wells "said 'Yes. Absolutely.' And at that point [appellant] said, 'I rescind my consent.' " (Tr. Vol. I, 25.)

Officer Wells and the other officers then "exited the house with Mr. Walker."  (Tr. Vol. I, 25.)

{¶ 31}  During the suppression hearing, Sergeant Snider testified as to his actions following receipt of the dispatch reporting an alleged shooting incident.  When Sergeant Snider arrived at 3973 Andrus Avenue, two other police officers, including Officer Wells, were already at the scene.  Officer Wells asked appellant "if it was all right if we entered his home to search.  And he replied he was okay."  (Tr. Vol. I, 48.)  Inside the apartment, Sergeant Snider observed a closet in the living room area; the door "was now open at this point * * * revealing a safe * * * in the closet, a rather large safe."  (Tr. Vol. I, 50.)  Appellant told the officer that it was his safe.  Appellant told Sergeant Snider "that it was unlocked," and that he could open it.  (Tr. Vol. I, 50.)  Sergeant Snider responded that he would prefer appellant open it, and appellant then "actually opened it."  (Tr. Vol. I, 50.)  Sergeant Snider observed "an assault rifle present inside the safe."  (Tr. Vol. I, 50.)

{¶ 32}  A short time later, Officer Wells "asked Mr. Walker if it was okay to go upstairs.  And Mr. Walker said no it was not.  He wanted to stop the searching, so that was done.  We stopped."  (Tr. Vol. I, 52.)  At that point, "we exited the apartment and * * * I called for detectives to come over to work on the process of trying to obtain a search warrant."  (Tr. Vol. I, 52.)

{¶ 33}  After appellant rescinded his consent, Sergeant Snider spoke with appellant, asking him "to confirm that he did give us the approval to enter the apartment as he did  and search."  (Tr. Vol. I, 52.)  Sergeant Snider asked appellant if he would sign a " 'Consent to Search form' * * * agreeing to the fact that he had given us the verbal consent to enter the apartment and search."  (Tr. Vol. I, 52.)  During the suppression hearing, Sergeant Snider identified the state's exhibit No. 20 as "a City of Whitehall Division of Police Consent to Search Without a Warrant form."  (Tr. Vol. I, 53.)  The form contained appellant's signature, indicating a time of 5:30 p.m., and Sergeant Snider's "signature as witness."  (Tr. Vol. I, 53.)

{¶ 34}  Appellant testified on his own behalf and gave the following account of the events.  On the date of the incident, appellant walked out of his apartment and observed three police officers "coming from the side of the building" with "their guns pulled." (Tr. Vol. I, 63.)  Brady was still inside the apartment, but he came out "probably ten

seconds later."  (Tr. Vol. I, 64.)  The officers informed appellant and Brady about a report of some "shots fired at a female."  (Tr. Vol. I, 64.)  Appellant told Officer Wells that Brady and his girlfriend were "going through a situation and all that."  (Tr. Vol. I, 64.)

{¶ 35} The officers then patted appellant down and handcuffed him.  After approximately ten minutes, the officers removed the handcuffs.  Appellant testified that the officers "asked me for consent when they first got there."  (Tr. Vol. I, 65.)  According to appellant, "[t]hey said, 'Can we search the house?' I said, 'No, you cannot.'  I told them we didn't have no weapons."  (Tr. Vol. I,  65.)  The officers "kept asking me about the search. And I said no because we didn't do nothing."  (Tr. Vol. I, 66.)  Appellant "told them no at least 10 times, at least."  (Tr. Vol. I, 66.)

{¶ 36} Appellant related that the officers "kept Brady cuffed in the car.  They pulled off with Brady in the car.  They come back.  The detective said 'We're going in.'  He opened the door with his gun pulled and said 'We're going in.'  And they went in.  That was it." (Tr. Vol. I, 66.)  Appellant was standing in the parking lot as the officers went inside.  The officers then "brung me in.  They said 'Look at this.' * * * So I walked to the bathroom because an officer was standing there.  And I looked.  And I see his drugs on the floor." (Tr. Vol. I, 67.)  Appellant told the officers, "I don't know nothing about that. * * * You got to ask Brady about that."  (Tr. Vol. I, 67.)

{¶ 37} Appellant testified that the officers observed the gun safe on the first floor, and one of the officers "told me that if I didn't open it they was gonna bust it up." (Tr. Vol. I, 68.)  Appellant told the officers "I don't want you all busting up my safe.  So you all gonna bust it up I just going to open it for you if you going to bust it up."  (Tr. Vol. I, 68.)

{¶ 38} With respect to signing a consent form, appellant stated that "[w]hatever I signed was at 9:00 something that night after they took me to jail."   (Tr. Vol. I, 70.) According to appellant, the detective "slid the papers from under papers, and said this is just a bunch of papers talking about what we took from the house this and that.  He said so just sign it."  (Tr. Vol. I, 70.)  When asked on cross-examination about the consent to search form, appellant initially denied he had ever seen the document.  He acknowledged, however, that his signature was on the form, but stated: "I didn't know I was signing a consent form to search."  (Tr. Vol. I, 72.)

{¶ 39} In denying the motion to suppress, the trial court initially determined that the officers had probable cause to stop and approach appellant and Brady at the residence based on "[t]he alleged shooting, the report of a shooting, the identification of the individual, the identification of the car, and an address," as well as the fact "the defendant himself acknowledged this confrontation or meeting took place." (Tr. Vol. I, 80.)

{¶ 40} The trial court next addressed the issue of consent. The court agreed with counsel for appellant that "there were some inconsistencies in the officers' testimony," as "Officer Wells had the consent given outside," while Sergeant Snider testified "consent was given inside." (Tr. Vol. I, 80.) The trial court also noted an "inconsistency" in the testimony regarding the gun safe, as "Officer Wells * * * indicated that it was locked," while Sergeant Snider "indicated that it was unlocked." (Tr. Vol. I, 81.) The court further noted, however, that both officers "did acknowledge the defendant had to open it," and the court found "[t]he fact that there's some inconsistencies in testimony is not surprising." (Tr. Vol. I, 81.) Rather, the court observed, the incident occurred "some 18 months" ago, and "if the stories matched up perfectly, the court might be a little suspect as to whether or not it was rehearsed or not." (Tr. Vol. I, 81.)

{¶ 41} During the suppression hearing, the trial court made the following further findings on the record concerning witness credibility:

> What I find most telling on this matter are three particular things. * * * First of all, starting with counsel's words that common sense says you're going to open this [safe] up because it's a big thing, I would use common sense looking at this picture, this is [a] very large * * * gun safe. It must be * * * at least four-feet tall. And I would guess at least a couple feet wide. And it's got a large swivel handle in addition to the lock.
>
> This is not some office supply store safe. This is a substantial locker. To be worried about somebody "busting it open," I don't know. Busted open with what? That just doesn't make any sense applying the common sense standard that I was asked to apply which mitigates in favor of the officers' recollection of what happened.
>
> And then there's this signed consent form. The defendant acknowledged that he's the one that signed it. And it's according to the time it appears to be on the same side, the

date and time is on the same side as the defendant's side. There's a different date on the side where Sergeant Snider signed. And the time on this on the same line where on the defendant's side of signing it is the time 5:30. Again not 9:00. Not downtown. So, I mean, again, mitigating in favor of the officers' recollection.

And finally what really pushed me over if there was any question at all, the defendant testifies that I told him 10 times they can't go in. They said we don't care. We're going in anyhow. Yet these are the same officers who the defendant acknowledged once inside and told you can't go upstairs say okay and leave voluntarily and go get a warrant.

Why would two officers who didn't care what the defendant said about going in after being specifically told according to the defendant that you cannot go in, why would * * * these same two officers comply with the defendant's request when being told to leave? Again, much like the safe, much like the testimony regarding the consent form simply does not make any sense.

(Tr. Vol. I, 82-84.)

{¶ 42} As noted, appellant challenges the testimony of the officers regarding his signature on the consent to search form. Appellant deems it odd that Sergeant Snider would expect him to sign the form immediately after purportedly revoking his oral consent to search the first floor of the apartment. Appellant contends he had no idea what he was signing, and that the more credible assessment is that the officer used deception. On this point, appellant credits his own testimony that he believed the officer misled him into signing the document at the police station later that evening, around 9:00 p.m., and that the officer told him the form dealt with property taken from the residence.

{¶ 43} The record of the suppression hearing reflects that the trial court heard conflicting versions of the events at issue. In considering that testimony, the court found more credible the officers' account of the events surrounding appellant's signature on the consent to search form, citing in part the fact that appellant acknowledged signing the form, and that the form listed the time as 5:30 p.m. (rather than 9:00 p.m.). The trial court also deemed less than credible appellant's testimony that he told the officers at least ten times they could not enter the apartment; rather, the court found that appellant's

version did not make "sense" in light of the fact the officers, after appellant declined their request for permission to go upstairs, immediately exited the residence and pursued a search warrant. Here, the trial court was in the best position to resolve factual questions and evaluate the credibility of the witnesses, and it was within the province of the court to determine whether to credit appellant's testimony or that of the officers.

{¶ 44} Further, while the trial court acknowledged a discrepancy between the officers' testimony as to whether appellant signed the consent to search form prior to or after the search of the first floor, the court found that such inconsistency could be explained by the fact that Sergeant Snider initially "wasn't there." Specifically, the trial court observed, "Officer Wells could have gotten his consent earlier and [Sergeant] Snider got independent consent later." (Tr. Vol. I, 80.) Upon review, we find that the trial court's resolution of an apparent discrepancy was not unreasonable.

{¶ 45} Appellant also disputes the credibility of Sergeant Snider's claim that a security issue precluded him from obtaining appellant's signature on the consent to search form until after the search of the first floor. A review of the transcript of the suppression hearing reflects that Sergeant Snider, during direct examination, was questioned as to why he did not utilize the consent to search form prior to the search. Sergeant Snider explained that, upon arriving at appellant's apartment, police officers informed him that appellant and another individual, identified as "the primary suspect" in the shooting, "had been patted down for officer safety," but that "there had not been any type of protective sweep * * * inside the apartment." (Tr. Vol. I, 55.) Sergeant Snider testified that, because "verbal consent was already given * * * I thought I could get this protective sweep where I could feel comfortable that there's no danger to officers while inside the apartment." (Tr. Vol. I, 55.) Upon review, we do not find error by the trial court in accepting the officer's explanation on this issue.

{¶ 46} Based on the suppression record, we conclude that the trial court could have reasonably credited the officers' accounts that appellant initially gave oral consent to the search of the first floor of the apartment and that the officers stopped the search to obtain a warrant after appellant rescinded such consent following the officers' inquiry as to the upstairs portion of the residence. Accordingly, having properly determined that the

warrantless search was justified by consent, the trial court did not err in denying appellant's motion to suppress.

{¶ 47} Based on the foregoing, appellant's first assignment of error is not well-taken and is overruled.

{¶ 48} We will next address appellant's third assignment of error, under which he raises a claim of ineffective assistance of trial counsel. Appellant argues that his counsel's performance was deficient during closing argument in failing to discuss where the reasonable doubt arose in this case; specifically, appellant contends that counsel did not challenge the fact police investigators performed no latent print tests on either firearm, nor did counsel mention the lack of DNA testing with respect to the firearms. Appellant also contends there was no direct evidence as to how the cocaine or weapon made it into the dresser drawer in the northeast upstairs bedroom, and he cites as deficient performance defense counsel's failure to discuss the fact that two other individuals (besides himself) had access to all of the rooms in the apartment.

{¶ 49} The Supreme Court of Ohio has adopted the two-part test set forth in *Strickland v. Washington,* 466 U.S. 668 (1984), for ineffective assistance of counsel. *State v. Bradley,* 42 Ohio St.3d 136, 142 (1989). Pursuant to this test, "[c]ounsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *Id.* at paragraph two of the syllabus. In order to demonstrate prejudice, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.* at paragraph three of the syllabus.

{¶ 50} The record belies appellant's claim that defense counsel failed to discuss the fact that two other individuals had access to the rooms in the apartment. During closing, counsel for appellant argued "there's not just one person in this apartment." (Tr. Vol. III, 566.) Counsel highlighted the fact "that there are actually three people that had resided in this apartment * * * at Andrus," i.e., appellant, "Mr. Cobb who lived in the basement," and "Frederick Brady." (Tr. Vol. III, 566.) Defense counsel also emphasized to the jury that Brady "had the run of the upstairs." (Tr. Vol. III, 572.) Because the record does not

support appellant's claim that his counsel failed to argue this issue, appellant cannot demonstrate deficient performance.

{¶ 51} As noted, appellant also contends his counsel was deficient for failing to bring to the attention of the jury the lack of DNA testing with respect to the firearm. The record indicates that defense counsel cross-examined Detective Earl as to whether police investigators tested the firearm found in appellant's bedroom for DNA or latent prints. The detective acknowledged that investigators had not analyzed the firearm for latent prints. With respect to the issue of DNA testing, Detective Earl testified that it was his understanding that BCI "would not accept * * * DNA testing on that." (Tr. Vol. II, 300-01.)

{¶ 52} In general, "[t]he content of a closing argument is * * * considered a tactical decision." *State v. Palmer,* 7th Dist. No. 04-JE-41, 2006-Ohio-749, ¶ 104. Further, "[t]actical or strategic trial decisions, even if ultimately unsuccessful, do not generally constitute ineffective assistance." *State v. Jones,* 10th Dist. No. 02AP-577, 2003-Ohio-952, ¶ 14.

{¶ 53} As cited above, Detective Earl testified at trial that BCI would not have accepted DNA testing on the weapon in a firearm possession case. When defense counsel inquired as to the reasoning, the detective cited BCI's rules for entering information, stating "it will not be submitted into the database for DNA is my understanding of the rules." (Tr. Vol. II, 301.) In light of testimony that BCI would not have accepted DNA testing of a firearm under these circumstances, defense counsel may have decided, as a matter of strategy, not to focus on the state's failure to pursue such testing.

{¶ 54} A review of the record indicates that counsel's strategy was to cast aspersions on one of the occupants, Brady, asserting that all of the drugs found in the apartment belonged to him. Counsel noted that Brady admitted that the crack cocaine and heroin found in the first floor bathroom belonged to him. Counsel also highlighted the fact that detectives discovered a stolen 9 mm Walther handgun in the room identified as Brady's bedroom. As previously noted, counsel argued to the jury that Brady "had the run of the upstairs." (Tr. Vol. III, 572.) Finally, trial counsel stressed Shonda's testimony that appellant was essentially residing with her at the time of the events. Upon review, appellant has failed to demonstrate that counsel's performance fell below an objective

standard of reasonableness or that, but for counsel's error, the result of the proceedings would have been different.

{¶ 55} Accordingly, appellant's third assignment of error is not well-taken and is overruled.

{¶ 56} Appellant's second and fourth assignments of error are interrelated and will be considered together. Under the second assignment of error, appellant contends the trial court committed plain error in instructing the jury on the firearm specification under R.C. 2941.141 by failing to give an instruction that followed the recommendation as set forth by the Ohio Jury Instructions ("OJI"). Under the fourth assignment of error, appellant argues that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶ 57} We first consider appellant's sufficiency and manifest weight challenges to his conviction for possession of cocaine and the attendant firearm specification. At the outset, we note the distinction between claims of sufficiency and manifest weight of the evidence. In *State v. Martin,* 10th Dist. No. 14AP-189, 2014-Ohio-4447, ¶ 19-20, this court discussed those distinctions, holding in part:

> In reviewing the "record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *Id.*, quoting *State v. Jenks,* 61 Ohio St.3d 259 * * * (1991), paragraph two of the syllabus.
>
> In contrast to a sufficiency argument, a reviewing court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact." *State v. Vasquez,* 10th Dist. No. 13AP-366, 2014-Ohio-224, ¶ 49. Rather, an appellate court "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.*

{¶ 58} R.C. 2925.11(A) governs the crime of possession of drugs and states as follows: "No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." Pursuant to R.C. 2925.01(K), " '[p]ossess' or 'possession'

means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found."

{¶ 59} In addition to his conviction for possession of drugs, the jury also found appellant guilty of the firearm specification under R.C. 2941.141. Pursuant to R.C. 2941.141(A), "[i]mposition of a one-year mandatory prison term upon an offender * * * is precluded unless the indictment * * * specifies that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense."

{¶ 60} In order to sustain a conviction for a firearm specification, "the state must first prove that the firearm existed," and that "it was operable at the time the offense was committed." *State v. Harry,* 12th Dist. No. CA2008-01-013, 2008-Ohio-6380, ¶ 53. The state is then required to establish, "beyond a reasonable doubt, that the offender committed a felony, and the offender had the weapon on or about his person or under his control while committing the felony." *Id.* The term "firearm" is defined to mean "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant," and "includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable." R.C. 2923.11(B)(1).

{¶ 61} In arguing that the evidence was insufficient to support his conviction, appellant notes that police officers found no drugs or weapons on his person, and he reiterates the argument, raised under his third assignment of error, that his trial counsel should have stressed the fact that two other individuals had access to the house and his bedroom. Appellant also contends the evidence was insufficient to support the firearm specification because the firearm discovered upstairs was not conveniently accessible or within his immediate reach while in the presence of police officers; specifically, appellant argues he was only on the first floor of the apartment at the time officers first entered the apartment.

{¶ 62} As set forth under the facts, the state presented testimony that appellant gave the officers verbal consent to enter his apartment on the afternoon of the alleged shooting incident, and that he accompanied the officers inside the apartment at the time they discovered drugs in the first floor bathroom. However, as to the cocaine and weapon found in the upstairs northeast bedroom, police officers conducted the search of that

room later in the evening after obtaining a search warrant. Because the drugs and loaded handgun discovered upstairs were found pursuant to the search warrant, the state did not proceed under a theory of actual possession (i.e., that the contraband was on or about appellant's person); rather, the state proceeded under a theory of constructive possession.

{¶ 63} Under Ohio law, "a person may knowingly possess a substance or object through either actual or constructive possession." *State v. Hilton,* 9th Dist. No. 21624, 2004-Ohio-1418, ¶ 16, citing *State v. McShan,* 77 Ohio App.3d 781, 783 (8th Dist.1991). A person has actual possession of a substance or object "when it is within his immediate physical control." *State v. Coffman,* 5th Dist. No. 07 CA A 08 0042, 2008-Ohio-2163, ¶ 25, citing *State v. Messer,* 107 Ohio App.3d 51, 56 (9th Dist.1995). By contrast, "[c]onstructive possession exists when an individual knowingly exercises dominion and control over an object, even though that object may not be within his immediate physical possession." *State v. Hankerson,* 70 Ohio St.2d 87 (1982), syllabus.

{¶ 64} Further, "[w]hen a weapon is not found on the defendant's person, but instead found in another room, the weapon may be under a defendant's control for the purposes of R.C. 2941.141." *Harry* at ¶ 53, citing *State v. Brown,* 107 Ohio App.3d 194 (3d Dist.1995) (weapon found in bedroom, while defendant was in living room, was under defendant's control). Thus, "all that is necessary is that the defendant have the firearm on or about his person or under his control '*at some point*' during the crime's commission." (Emphasis sic.) *Harry* at ¶ 53.

{¶ 65} As noted by the state, Ohio courts have rejected the argument that "the underlying drug offense and corresponding firearm possession occur only at the moment the police execute the search warrant." *State v. Wilkins,* 12th Dist. No. CA2007-03-007, 2008-Ohio-2739, ¶ 26, citing *State v. Benton,* 8th Dist. No. 82810, 2004-Ohio-3116. In *Benton,* police officers executed a search warrant at the defendant's house, during which they seized numerous items including weapons and drugs. Officers also found cocaine and a weapon in a vehicle belonging to the defendant's wife, located in a detached garage. The defendant, who was inside his home at all times during the execution of the search warrant, was convicted of possession of drugs and a one-year mandatory firearm specification arising out of the weapon and drugs discovered in the vehicle.

{¶ 66} On appeal, the defendant argued that he did not possess the firearm during the commission of the drug possession offense, and that the trial court's application of constructive possession to the firearm specification was erroneous. Specifically, the defendant in *Benton* argued that legislature "defined the 'on or about the offender's person or under the offender's control' element of the firearm specification in Ohio Jury Instruction 413.37." *Benton* at ¶ 18. The decision in *Benton* quoted the language from that jury instruction as providing as follows: " 'On or about his/her person' or 'under his/her control' means that the firearm was either carried on the defendant's person or was so near the defendant's person as to be conveniently accessible within his/her immediate physical reach." *Id.* at ¶ 19.

{¶ 67} Relying on the above cited jury instruction, the defendant in *Benton* argued that the statute "requires more than constructive possession of a firearm during the commission of an offense; it requires the State to prove that the offender had the firearm on his or her person or that the firearm was so close to the offender that it was immediately accessible." *Id.* at ¶ 20. The defendant further argued the state failed to prove the elements of the firearm specification because it offered "no evidence that he ever carried the gun or was in the car or ever closer than 25 feet to the gun * * * when the search was executed and the drugs and gun were found." *Id.*

{¶ 68} The reviewing court in *Benton* rejected this argument, finding the trial court properly concluded the defendant had constructive possession of the weapon and was therefore guilty of the firearm specification. In so holding, the court relied on Ohio cases indicating that "an offender can be found guilty of a firearm specification for an underlying drug possession offense even where the gun is not on the offender's person during the execution of a search warrant." *Id.* at ¶ 25, citing *Brown* and *State v. Spurlock,* 3d Dist. No. 5-03-11, 2003-Ohio-6006.

{¶ 69} The court in *Benton* specifically rejected the assumption that "the underlying drug possession offense and corresponding firearm possession occurs only at the moment the police execute the search warrant." *Id.* at ¶ 29. Rather, the court relied on language from a Supreme Court decision holding that "the firearm specification statute 'does not require that the firearm be used in the commission of the felony, or that the defendant acquire the firearm before beginning the crime; all that is necessary is that the

defendant have the firearm on his person or under his control *at some point* during the commission of the crime.' "  (Emphasis sic.)  *Id.,* quoting *State v. Powell,* 59 Ohio St.3d 62, 63 (1991).  The court in *Benton* thus found, despite the fact "the gun was not carried on [the defendant's] person or even immediately accessible to him when the police executed the warrant," it was "apparent" that the defendant "was in possession of both the cocaine and the gun *before* the police arrived at his home to execute the warrant." (Emphasis sic.)  *Benton* at ¶ 30.

{¶ 70} Other Ohio courts have made similar determinations.  *See Wilkins* at ¶ 27 (where evidence showed the appellant lived in residence where drugs and firearm were found in dresser drawer with other items belonging to him, trier of fact reasonably found he was in possession of firearms at some point during commission of drug trafficking offenses even though "the gun was not carried on his person or even immediately accessible to him when the search warrant was executed or during his arrest").  *See also State v. Conway,* 8th Dist. No. 86140, 2005-Ohio-6634, ¶ 12 (evidence sufficient to support convictions for drug possession and firearm specification where weapon and drugs were found in upstairs bedroom dresser even though defendant was secured downstairs; the fact defendant "was secured in the downstairs of the house is inconclusive of where he was prior to the time the police entered the premises," and reasonable minds "could conclude that the gun belonged to defendant and that he used it in connection with the charged offenses"); *State v. White,* 8th Dist. No. 82495, 2004-Ohio-228, ¶ 14-16 (rejecting appellant's argument that firearm specification under R.C. 2941.141 was improperly imposed because weapon was located in bedroom of house when police executed search warrant and there was no evidence appellant had a gun on his person or under his control while committing the offense of drug trafficking; weapon was located within appellant's easy access, in his bedroom, and he constructively possessed weapon by exercising dominion and control at the time of drug trafficking offense).

{¶ 71} In the instant case, neither the firearm nor drugs were found within appellant's immediate physical possession; the issue, therefore, was whether appellant had the ability to exercise dominion and control over the items "sufficient to show constructive possession."  *State v. Tyler,* 8th Dist. No. 99402, 2013-Ohio-5242, ¶ 17. Dominion and control over an object "may be proven by circumstantial evidence alone."

*State v. Trembly,* 137 Ohio App.3d 134, 141 (8th Dist.2000). *See also State v. Combs,* 2d Dist. No. 11949 (Sept. 10, 1991) ("That the defendant exercised dominion or control over drugs may be indirectly proven, through circumstantial evidence, even when the defendant is not present when the drugs are found"); *State v. Fry,* 9th Dist. No. 23211, 2007-Ohio-3240, ¶ 47 ("circumstantial evidence is sufficient to support the elements of constructive possession").

{¶ 72} Further, "in determining whether a defendant knowingly possessed a controlled substance, it is necessary to examine all of the facts and circumstances surrounding the incident." *State v. Mabry,* 2d Dist. No. 21569, 2007-Ohio-1895, ¶ 20. *See also Harry* at ¶ 52 (the trier of fact may consider "all relevant facts and circumstances surrounding a crime," including "the common fact that drugs and weapons are often found within close proximity to one another").

{¶ 73} Here, construing the facts most strongly in favor of the prosecution as we are required to do in considering a sufficiency challenge, the state presented evidence that appellant leased the apartment on Andrus Avenue. When police officers initially arrived at the residence on the afternoon of the alleged shooting incident, appellant was exiting the apartment. Later that evening, after obtaining the search warrant, police officers found the drugs and loaded weapon in the upstairs northeast bedroom identified as appellant's bedroom. The drugs and weapon were located in close proximity to each other in the same dresser drawer. According to a detective, appellant acknowledged the northeast bedroom "was his," and the state introduced other evidence of personal belongings indicating appellant's connection to the room, including mail addressed to him found on the dresser in which the officers found the drugs and weapon.

{¶ 74} Upon review, the state presented sufficient evidence that, if believed, permitted the trier of fact to conclude that appellant resided at the apartment and had knowledge of, as well as dominion and control over, the drugs and weapon located in the dresser drawer of the northeast bedroom. As such, the evidence was sufficient to establish appellant's constructive possession. Further, with respect to the firearm specification, testimony that the firearm was located in close proximity to the drugs (i.e., in the same dresser drawer) provided evidence to support a finding that the weapon was under appellant's control during the commission of the felony offense. *State v. Byrd,* 8th

Dist. No. 98037, 2012-Ohio-5728, ¶ 22 (noting cases finding sufficient evidence to support firearm specification attached to drug possession counts "in instances where the firearm is recovered in close proximity to the drugs"). *See also Harry* at ¶ 54 (evidence sufficient to support firearm specification under R.C. 2941.141; even though weapons were not on or about appellant's person when police arrived, due to their location in home, jury could reasonably conclude that weapons were under appellant's control at some point when he committed the crime of drug possession); *State v. Seljan,* 8th Dist. No. 89845, 2008-Ohio-1707, ¶ 21 (affirming conviction for firearm specification in drug trafficking case in which police found weapon in bedroom in which drugs and scale were also found, "which supports the fact that the firearm was under appellant's control while committing the offenses").

{¶ 75} Appellant points to evidence that two other individuals had access to the apartment and bedroom. However, the fact that other individuals had access to the residence "is not dispositive of the issue of whether [appellant] had constructive possession" of the drugs and weapon. *Tyler* at ¶ 24. In this respect, "[e]xclusive control over the premises is not required." *Id.* Here, despite evidence that other individuals shared the residence, the trier of fact could infer that appellant had dominion and control over the drugs and weapon discovered in the northeast bedroom based on evidence of appellant's relationship to the room and other personal effects.

{¶ 76} We further find that the weight of the evidence supported appellant's conviction for drug possession and the attendant firearm specification. As outlined above, the state presented sufficient evidence to establish that appellant exercised dominion and control over the area in which the drugs and weapon were found (i.e., the dresser drawer of the northeast upstairs bedroom), and a rational trier of fact could have reasonably determined he was in constructive possession of the drugs and weapon found therein. Accordingly, we cannot say the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction is against the manifest weight of the evidence.

{¶ 77} Appellant also contends that the trial court erred in failing to provide a complete jury instruction with respect to the firearm specification. Appellant argues that defense counsel filed a motion for proposed jury instructions on July 30, 2014, seeking the court to follow the OJI definition for "on or about his person, or under his control."

(Appellant's Brief, 15.)   Appellant notes that OJI defined that term to mean that "the firearm on the defendant's person or so near to the Defendant's person as to be conveniently accessible and within his immediate physical reach."  (Appellant's Brief, 15.)

{¶ 78} At the outset, as noted by the state, the record does not indicate that appellant objected to the instruction provided by the trial court with respect to the firearm specification at issue.   Rather, when the court resumed the trial proceedings on the morning of August 15, 2014, the court noted on the record: "First of all, * * * we had a productive meeting last night with regard to the jury instructions.  I made the changes this morning that we all agreed on."  (Tr. Vol. III, 467.)  The trial court then inquired of the parties whether there were any objections.  Counsel for appellant requested that the court include a definition of "specially adapted" with respect to the firearm specification under R.C. 2941.144 (i.e., that the offender had an automatic firearm).  Counsel, however, did not challenge the instructions with respect to the firearm specification under R.C. 2941.141.

{¶ 79} The decision whether to issue a particular jury instruction lies within the sound discretion of the trial court.  *State v. Cobb,* 11th Dist. No. 2007-P-0004, 2007-Ohio-5614, ¶ 24.  Thus, a reviewing court "will not reverse a decision concerning the giving of jury instructions absent an abuse of discretion." *Id.*

{¶ 80} In the context of a criminal case, a reviewing court "should invoke the plain error doctrine with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice."  *State v. Daugherty,* 11th Dist. No. 2001-T-0024 (Mar. 15, 2002). Thus, "it is generally accepted that plain error does not exist unless, but for the error, the outcome of the proceeding would have been different." *Id.*

{¶ 81} In general, "a defendant is entitled to have the jury instructed on all elements that must be proved to establish the crime with which he is charged." *State v. Adams,* 62 Ohio St.2d 151, 153 (1980).  However, "a trial court's failure to separately and specifically charge the jury on every element of each crime with which a defendant is charged does not *per se* constitute plain error nor does it necessarily require reversal of a conviction." *Id.* at 154.  Rather, "[o]nly by reviewing the record in each case can the probable impact of such a failure be determined, and a decision reached as to whether

substantial prejudice may have been visited on the defendant, thereby resulting in a manifest miscarriage of justice." *Id.*

{¶ 82} In the present case, the trial court instructed the jury in part as follows: "You must decide whether the defendant is guilty of Specification Two as set forth in Count One of the indictment. You must decide whether the state has proved beyond a reasonable doubt the defendant had a firearm on or about his person or under his control while committing the offense." (Tr. Vol. III, 601.) As part of its instruction, the court provided the jury with the definition of a firearm, i.e. "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant," including "an unloaded firearm or any firearm which is inoperable but which can readily be rendered operable." (Tr. Vol. III, 601.)

{¶ 83} The court also instructed on constructive possession, stating in part: "The possession of an item can exist without physical contact so long as the person has dominion and control over it. Such dominion and control without physical custody is called constructive possession." (Tr. Vol. III, 599-600.) The court further instructed the jury that "the mere fact contraband is located within the premises under one's control does not in and of itself constitute constructive possession. It must also be shown the person was conscious of the presence of the contraband. Circumstantial evidence alone is sufficient to support the element of constructive possession." (Tr. Vol. III, 600.)

{¶ 84} Similar to his sufficiency argument, appellant contends that he remained on the first floor of the apartment, in the presence of the officers, at the time of the initial search; appellant maintains, therefore, he was nowhere near any firearm found on the premises which could be construed as conveniently accessible or within his immediate physical reach at the time of the initial search.

{¶ 85} We have previously noted, however, that the state's theory of the case with respect to the drugs and weapon found in the upstairs northeast bedroom (after police officers obtained a search warrant) was based on constructive possession rather than actual possession. We have also discussed (and agree with) the state's argument that Ohio courts have rejected the proposition that "the underlying drug possession offense and corresponding firearm possession occurs only at the moment the police execute the search warrant." *Benton* at ¶ 29. *See also Wilkins* at ¶ 26. As also previously discussed,

under Ohio law, "[c]onstructive possession exists when an individual knowingly exercises dominion and control over an object, even though that object may not be within his immediate physical possession." *Hankerson* at syllabus.

{¶ 86} Here, the trial court informed the jury that it needed to find beyond a reasonable doubt that appellant had a firearm on or about his person or under his control while committing the offense. As indicated, the court also instructed the jury with respect to constructive possession, which requires dominion and control over the object. Based on our review, the jury instructions provided by the trial court with respect to the firearm specification and the related instruction on constructive possession adequately reflected case law regarding those concepts, as well as the type of possession at issue in this case, and we do not find that the trial court committed plain error in refusing to include in its instructions the language from OJI cited by appellant.

{¶ 87} Accordingly, appellant's second and fourth assignments of error are without merit and are overruled.

{¶ 88} Based on the foregoing, appellant's first, second, third, and fourth assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

SADLER and LUPER SCHUSTER, JJ., concur.