[Cite as *State v. Small*, 2018-Ohio-3943.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellant, | : | No. 17AP-551 |
| | | (C.P.C. No. 17CR-802) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Ejuan Small, | : | |
| Defendant-Appellee. | : | |

———————

D E C I S I O N

Rendered on September 27, 2018

———————

**On brief**: *Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellant. **Argued**: *Seth L. Gilbert*.

**On brief**: *Lisa M. Tome*, for appellee. **Argued**: *Lisa M. Tome*.

———————

APPEAL from the Franklin County Court of Common Pleas

BROWN, P.J.

{¶ 1} This is an appeal by plaintiff-appellant, State of Ohio, from a judgment of the Franklin County Court of Common Pleas granting a motion to suppress filed by defendant-appellee, Ejuan Small.

{¶ 2} On February 8, 2017, appellee was indicted on one count of carrying a concealed weapon, in violation of R.C. 2923.12, one count of improperly handling a firearm in a motor vehicle, in violation of R.C. 2923.16, and one count of having a weapon while under disability, in violation of R.C. 2923.13. On February 15, 2017, appellee entered a plea of not guilty. On April 5, 2017, appellee filed a motion to suppress. On April 18, 2017, the state filed a memorandum contra the motion to suppress.

{¶ 3} On July 24, 2017, the trial court conducted a hearing on the motion to suppress. During the hearing, the state presented the testimony of Columbus Police Officers Mark Wolf and Jerry Ward, while appellee presented the testimony of Shana Thomas.

{¶ 4} On the evening of January 28, 2017, Officer Wolf was in a patrol car traveling north on Saint Clair Avenue when he observed a vehicle merge into the left turn lane before turning onto East Second Avenue. Officer Wolf testified the driver "failed to signal into the turn lane, and then as she did turn onto Second Avenue, she didn't signal 100 feet within her turn." (Tr. at 25.)

{¶ 5} Officer Wolf initiated a traffic stop at 10:53 p.m., and the stop was recorded on the cruiser's video camera. The officer exited his cruiser and approached the driver's side of the vehicle. Officer Wolf observed two individuals inside the vehicle, a female driver, later identified as Thomas, and a male passenger, appellee.

{¶ 6} Officer Wolf testified the driver "appeared to be nervous." (Tr. at 13.) Approximately one minute after the stop, as Officer Wolf was speaking with the driver, Columbus Police Officers Josh Buck and Ward arrived at the scene. Officer Ward testified that, after receiving Officer Wolf's location on a police dispatch, he and Officer Buck stopped to assist Officer Wolf because "it's a known high-crime area." (Tr. at 33.) Officers Ward and Buck approached the passenger side of the vehicle as Officer Wolf was talking with the driver.

{¶ 7} Officer Wolf handed Officer Ward identification information to perform a warrant check. Officer Ward returned to his patrol wagon and ran a "LEADS and warrant check" on the driver. (Tr. at 35.) The officer also performed a check of the passenger based on an identification card. As a result of the LEADS check, Officer Ward discovered the driver had no outstanding warrants. Officer Ward also learned that the passenger, appellee, "had been charged with a gun and had a robbery case before too." (Tr. at 37.)

{¶ 8} Officer Wolf informed Officer Ward that he was "going to issue the driver a ticket for the * * * traffic violation." (Tr. at 37.) Officer Ward then handed Officer Wolf the identification information. As Officer Wolf began writing the citation, Officer Ward returned to the vehicle and spoke with the driver. Officer Ward noted that the occupants were "still visibly nervous." (Tr. at 41.) Officer Ward asked the driver "where they were

going, and she told me that she was going home on Sunbury Road.  And I explained to her * * * this is the opposite direction from there."  (Tr. at 42.)

{¶ 9}   Officer Ward then "asked her * * * if there were any weapons in the vehicle, and she stated, no.  But when she said that, she took * * * a deep gulp and swallowed and then she said no."  (Tr. at 42.)  The officer, aware of appellee's "previous history," then asked appellee "if he was done carrying guns, * * * and he said he hadn't been carrying a gun since the last time he was arrested."  (Tr. at 42.)  Appellee was "visibly nervous."  (Tr. at 42.)

{¶ 10} Officer Ward asked the driver "if we could check the car for * * * weapons, and search the car," and Thomas responded by stating "she did not have any weapons on her."  (Tr. at 42-43.)   Officer Ward then asked the driver whether appellee had any weapons, and "she said, [t]here's no weapons in the vehicle.  You can check the vehicle." (Tr. at 43.)  According to the officer "[s]he gave us consent."  (Tr. at 45.)

{¶ 11} Officer Ward testified appellee "was trying to maintain eye contact with Ms. Thomas as if he did not want her to give consent."  (Tr. at 43-44.)  At that point, Officer Buck asked appellee to step out of the vehicle "and as soon as he stepped out of the vehicle he was trying to maintain eye contact with Ms. Thomas."  (Tr. at 45.)   Officer Ward testified that, based on his experience, "that was very odd, very nervous" behavior.  (Tr. at 45.)  Officer Ward "immediately told [his] partner, [h]andcuff him right now.  Because I didn't * * * know what he was about to do."  (Tr. at 46.)  As soon as Officer Buck "popped his cuff case open [appellee] said, [o]kay.  I have a gun in my front waistband."  (Tr. at 46.)  The officers then handcuffed appellee and removed the weapon from him.

{¶ 12} The officers recovered the weapon from appellee at 11:01 p.m., eight minutes after Officer Wolf initiated the stop; Officer Wolf was still writing the citation at the time of the arrest.  After he completed writing the ticket, Officer Wolf handed the ticket to the driver and she drove away.  Appellee was placed under arrest for possession of weapons and taken into custody.

{¶ 13} Thomas testified on behalf of appellee, and stated he was her boyfriend. Thomas was nervous at the time of the stop because she "just didn't understand why we were being pulled over."  (Tr. at 66.)  According to Thomas, "after they pulled us over and took my information, they just kept saying I looked nervous and could they search my

car." (Tr. at 66.) Thomas stated the officer repeatedly asked to search the vehicle. Thomas testified: "I kept telling him no, but then * * * they went around to the side of my boyfriend and asked him to get out of the car. And then he just went ahead and searched the vehicle, but he didn't find anything in the vehicle." (Tr. at 68.) On cross-examination, Thomas stated she only gave the officers consent to search the vehicle after appellee exited the vehicle and the officers found the weapon on him.

{¶ 14} During the suppression hearing, counsel for appellee argued that "a traffic ticket should have been issued" and the driver and appellee "should have been free to leave at that point," but "[t]here was a continued unlawful detention." (Tr. at 82.) Counsel further argued the officers "had no reasonable suspicion to ask to search the vehicle," and they lacked "valid consent to ultimately search it." (Tr. at 82.) Counsel for appellee also argued it was "highly questionable whether there was probable cause to place [appellee] in handcuffs and he would have been under arrest at that point." (Tr. at 82.)

{¶ 15} Following the presentation of testimony, the trial court made findings on the record. The trial court initially determined the officer "could articulate a good faith reason for pulling the defendant over." (Tr. at 86.) The trial court further found that, once Officers Ward and Buck were aware "there are no warrants," the driver had "a valid driver's license," and the officers knew Officer Wolf was writing the citation, "[t]hat's where it should have ended, but they continued to engage." (Tr. at 87.) The court indicated it was "accepting the officer's story," but concluded it would grant the motion to suppress. (Tr. at 89.) By entry filed July 27, 2017, the trial court granted appellee's motion to suppress.

{¶ 16} The state, having filed an appeal of the trial court's ruling on the motion to suppress, pursuant to Crim.R. 12(K), sets forth the following assignment of error for this court's review:

> The trial court committed reversible error by granting the motion to suppress.

{¶ 17} On appeal, the state challenges the trial court's entry granting appellee's motion to suppress. Specifically, the state argues the trial court erred in granting the

motion based on a determination that police officers improperly "engaged" appellee while performing their duties.

{¶ 18} Under Ohio law, " '[a]ppellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses.' " (Internal citations omitted.) *State v. Roberts,* 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 100, quoting *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. Accordingly, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." Further, " '[a]ccepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.' " *Id.*

{¶ 19} The Fourth Amendment to the United States Constitution affords individuals protection from unreasonable searches and seizures. *State v. Keith,* 10th Dist. No. 08AP-28, 2008-Ohio-6122, ¶ 12, citing *State v. Kinney,* 83 Ohio St.3d 85, 87 (1998); *Terry v. Ohio,* 392 U.S. 1 (1968). A traffic stop by a law enforcement officer "implicates the Fourth Amendment and must comply with the Fourth Amendment's general reasonableness requirement." *State v. Fasline,* 7th Dist. No. 12 MA 221, 2014-Ohio-1470, ¶ 19. Further, " '[t]he scope and duration of a routine traffic stop "must be carefully tailored to its underlying justification * * * and last no longer than is necessary to effectuate the purpose of the stop." ' " *State v. Phillips,* 10th Dist. No. 14AP-79, 2014-Ohio-5162, ¶ 18, quoting *State v. Aguirre,* 4th Dist. No. 03CA5, 2003-Ohio-4909, ¶ 35, quoting *Florida v. Royer,* 460 U.S. 491, 500 (1983).

{¶ 20} A law enforcement officer has "sufficient cause to conduct a traffic stop if the officer witnesses a violation of a traffic law." *Fasline* at ¶ 19. When stopping a vehicle for a traffic violation, a law enforcement officer "may detain the motorist for a period of time sufficient to issue the motorist a citation and to perform routine procedures such as a computer check on the motorist's driver's license, registration and vehicle plates." *Aguirre* at ¶ 36, citing *State v. Carlson,* 102 Ohio App.3d 585, 598 (9th Dist.1995). Police may also conduct ordinary inquires to determine whether outstanding warrants exist. *State v. Sweeten,* 1st Dist. No. C-150583, 2016-Ohio-5828, ¶ 13. Further, " '[i]n

determining if an officer completed these tasks within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation.' " *Aquirre* at ¶ 36, quoting *Carlson* at 598. Because addressing the traffic infraction "is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.' " *Rodriguez v. United States,* 135 S.Ct. 1609, 1614 (2015), quoting *Royer* at 500.

{¶ 21} In diligently pursuing the purpose of a traffic stop, police officers "also may engage in other investigative techniques unrelated to the underlying traffic infraction or the safety of the officers." *United States v. Hill*, 852 F.3d 377, 382 (4th Cir.2017), citing *Rodriguez* at 1614-15. Such unrelated activity is permissible under the Fourth Amendment "only as long as that activity does not prolong the roadside detention for the traffic violation." *Id.* A police officer "may order the driver to get out of the car without violating the Fourth Amendment's proscriptions against unreasonable searches and seizures." *State v. Emmons,* 1st Dist. No. C-150636, 2016-Ohio-5384, ¶ 14. The officer "may also ask the driver and passengers about matters unrelated to the traffic stop itself, so long as those questions do not measurably extend the duration of the stop." *Id.,* citing *Rodriguez* at 1615. This is so "because such questions, absent a prolonged detention, do not constitute a 'discrete Fourth Amendment event.' " *United States v. Griffin,* 696 F.3d 1354, 1362 (11th Cir.2012), quoting *Muehler v. Mena,* 544 U.S. 93, 101 (2005).

{¶ 22} In the present case, the trial court initially found Officer Wolf "could articulate a good faith reason for pulling [Thomas] over for the traffic violation." (Tr. at 86.) Thus, the trial court found the evidence established a valid basis to initiate the traffic stop, and that finding does not appear to be in dispute on appeal.

{¶ 23} The trial court further found that, at the time Officer Wolf was writing the ticket, the other officers were aware "there [were] no warrants" and "there's a valid driver's license." (Tr. at 87.) The trial court determined: "That's where it should have ended, but they continued to engage." (Tr. at 87.) The trial court concluded it would grant the motion to suppress because the officer "continued to ask after everything was secured, continued to ask after he got the answer of no weapons." (Tr. at 89.)

{¶ 24} The state argues the trial court's determination that the Fourth Amendment prohibited the officers from "engaging" with the driver and passenger while another

officer wrote the citation, absent evidence that such inquiries extended the duration of the stop, was incorrect. Upon review, we agree with the state that the critical issue is not whether the officers made unrelated inquiries of the driver and passenger but, instead, whether such inquiries unreasonably prolonged the stop. *See Arizona v. Johnson,* 555 U.S. 323, 325 (2009), citing *Muehler* at 100-01 ("An officer's inquiries into matters unrelated to the justification for the traffic stop do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the stop's duration."); *Hill* at 382 (in diligently pursuing the purpose of a traffic stop, "an officer may question the occupants of a car on unrelated topics without impermissibly expanding the scope of a traffic stop").

{¶ 25} A review of the evidence, including the testimony and the cruiser video recording, indicates Officer Wolf initiated the stop at 10:53 p.m., at which time the officer exited his cruiser and walked to the driver's side of the stopped vehicle to speak with the driver. Approximately one minute later (22:54:16 on the cruiser's video recording), Officers Ward and Buck arrived at the scene and stood near the passenger window. At 10:55 p.m., Officer Ward obtained the driver's license of Thomas, as well as an identification card from appellee, to run a LEADS check. At 10:56 p.m., as Officer Ward was performing the LEADS check, Officer Wolf walked over to inform Officer Ward that he was going to issue a ticket for a traffic violation. At 10:58 p.m., as Officer Wolf began writing the citation, Officer Ward returned to the vehicle and spoke with Thomas. At 11:01 p.m., the officers recovered the weapon from appellee.

{¶ 26} Thus, the record indicates that approximately eight minutes elapsed from the time of the initial stop until the officers recovered the weapon. As noted by the state, Officer Wolf had not completed writing the ticket when the weapon was recovered from appellee's waistband. Here, accepting that Officer Ward's questions were unrelated to the investigation, such questioning occurred while Officer Wolf was still writing the citation, and the record does not support a finding that the inquiries by Officer Ward prolonged the length of the stop "beyond the time required for the initial purpose of the stop." *Emmons* at ¶ 17. *See also Phillips* at ¶ 21 (traffic stop not unduly prolonged by canine sniff which occurred before officer completed writing citation and only 15 minutes after traffic stop began, within normal time for processing and issuing traffic citation for

malfunctioning license plate light); *United States v. Garcia,* 284 Fed.Appx. 791, 794 (11th Cir.2008) ("Asking questions while still in the process of writing out a citation or awaiting the response of a computer check * * * does not extend the duration or scope of a valid initial seizure."); *State v. Norvett,* 9th Dist. No. 14CA0114-M, 2016-Ohio-3494, ¶ 18 (defendant not unlawfully detained at time dog sniff of vehicle occurred where officer conducting dog sniff arrived before the officer who stopped defendant had starting writing warning ticket, and less than ten minutes elapsed from the time of the traffic stop to the point defendant was read his *Miranda*[1] rights).  Nor does the record in this case suggest that Officer Wolf failed to act diligently during the stop.  Here, viewing the evidence under the totality of the circumstances, and given the amount of time (i.e., eight minutes) that elapsed between the stop and discovery of the weapon, we agree with the state that the trial court erred in granting the motion to suppress on the basis that the officers violated the Fourth Amendment by impermissibly engaging with Thomas and appellee.

{¶ 27} We note the state concedes other issues raised by appellee in the motion to suppress, and which the trial court did not address and/or reach in granting the motion, remain to be resolved (i.e., including the issue of consent and/or the validity of placing appellee in handcuffs at the time).  As we are only addressing the issue that formed the basis of the trial court's decision, and because the trial court did not resolve other issues raised by appellee's motion to suppress, we conclude this matter must be remanded for the court to address the remaining issues bearing on appellee's motion.

{¶ 28} Based on the foregoing, the state's single assignment of error is sustained, the judgment of the Franklin County Court of Common Pleas is reversed, and this matter is remanded to that court for further proceedings in accordance with law, consistent with this decision.

*Judgment reversed and cause remanded.*

KLATT and BRUNNER, JJ., concur.

_____

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1996).