[Cite as *State v. Sieng*, 2018-Ohio-5103.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                      :

    Plaintiff-Appellee,                      :

                                                        No. 18AP-39

v.                                                 :          (C.P.C. No. 14CR-6388)

Virsna A. Sieng,                                   :          (REGULAR CALENDAR)

    Defendant-Appellant.                     :

---

D E C I S I O N

Rendered on December 18, 2018

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Kimberly M. Bond*, for appellee.

**On brief:** *Keith A. Yeazel*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, Virsna A. Sieng, appeals from a judgment of the Franklin County Court of Common Pleas convicting appellant of possession of cocaine, in violation of R.C. 2925.11, with a firearm specification, and having a weapon while under disability, in violation of R.C. 2923.13. For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} The testimony at the suppression hearing reveals that on July 10, 2014, Detective Marcus Blevins of the Hilliard Division of Police was conducting surveillance of a home where appellant lived with his parents at 5521 Mirage Drive in Hilliard, Ohio. Blevins was part of the High Intensity Drug Trafficking Area ("HIDTA") task force, a cooperative

effort between state and federal law enforcement to combat illegal drug activities in Columbus, Ohio and surrounding areas.

{¶ 3}   At approximately 8:44 a.m., Blevins observed a Columbus Division of Police ("CPD") "paddy wagon" arrive at the residence.  (Tr. Vol. 1 at 42.)  According to Blevins, he met with one of the responding CPD officers, Brian Bishop, shortly after Bishop left appellant's residence, and Bishop told him it was the second time that morning that CPD had responded to a call from a female at the residence who reported a break-in.  Bishop reported that a sweep of the residence revealed no intruder.

{¶ 4}   At approximately 10:19 a.m., Blevins saw CPD return to the residence a third time.  On this occasion, police determined appellant's girlfriend was suffering either from a drug overdose or mental health issues, and they called paramedics to the scene. Appellant's girlfriend was taken to the hospital for medical assistance.

{¶ 5}   About one-half hour later, a maroon Chevrolet Impala with Vermont license plates stopped in front of appellant's residence, and Blevins saw the driver get out of the vehicle and go inside appellant's home.  Less than one hour later, the same man left the residence and drove away.  Blevins called CPD Detective Clint Smith, another member of the HIDTA task force, to provide Smith with the vehicle description and request a traffic stop.

{¶ 6}   According to Smith, after he caught up with the Impala, he observed the operator commit numerous traffic violations.  Because Smith was operating an unmarked police vehicle, he radioed ahead to Deputy Sheriff Robert McKee, a certified K-9 patrol officer with the Franklin County Sheriff's Office, who was also a member of the HIDTA task force.  Smith provided McKee with a description of the vehicle and informed him of the events that he and Blevins had previously observed.  McKee followed the Impala and observed the vehicle operator "[f]ail to yield for a red light at Roberts and Hillard-Rome." (Tr. Vol. 1 at 65.)  On cross-examination, however, McKee could not recall whether he had personally observed the violation or he had received the information from Smith.

{¶ 7}   McKee stopped the Impala at approximately 1:00 p.m., and he subsequently learned that the operator, Fredrick Akins, was a federal parolee who had been convicted of crimes related to illegal narcotics.  According to McKee, as he walked his dog, Blek, around the vehicle, Blek alerted to the presence of narcotics.  A subsequent search of the vehicle

did not reveal any narcotics.  McKee explained that trained drug detection dogs will often alert to the presence of narcotics for a period of time after they have either been consumed or removed from the vehicle.

{¶ 8}   About the same time McKee completed the traffic stop, Smith arrived at the scene and spoke with Akins.  According to Smith, Akins admitted that he had just been to appellant's home and that he believed appellant had a firearm and a large quantity of cocaine in the home.  He told Smith appellant was looking for a way to get the cocaine out of his house.  Akins also told Smith appellant was under the influence of narcotics.

{¶ 9}   Smith relayed the information to Blevins who was still watching appellant's home.  At or about that same time, Blevins observed appellant leave his house and proceed on foot to his vehicle.  According to Blevins, appellant had his "head on a swivel," which meant that he was scanning the area carefully as he approached his vehicle.  (Tr. Vol. I at 20.)  Blevins then saw appellant remove an item or package from the trunk of his car before going back inside.  Blevins described the item as a white plastic bag.  Blevins next observed appellant return to his vehicle a short time later and drive off.  Blevins requested a traffic stop and gave Smith and McKee a description of appellant's Acura.

{¶ 10} Smith testified at the suppression hearing that after he caught up with appellant's vehicle, he observed appellant commit several traffic violations, including failure to signal when turning south from Roberts Road onto Hilliard-Rome Road.  Smith relayed this information to McKee.  As McKee began to follow appellant's Acura in his cruiser, he personally observed appellant fail to signal as he turned his vehicle eastbound on Feder Road from Hilliard-Rome Road.  McKee initiated a traffic stop at approximately 2:02 p.m. and began walking Blek around appellant's vehicle.  Blek alerted to the presence of narcotics in the trunk area of the Acura, but no drugs were found.

{¶ 11} Smith arrived at the scene while McKee was still walking Blek around appellant's vehicle, and he engaged appellant in conversation.  When the traffic stop was nearly completed, Smith told appellant "we're pretty much done here unless you want to tell me what's going on at your house."  (Tr. Vol. 1 at 147.)  When appellant told Smith he was just returning from the store when McKee stopped him, Smith confronted appellant with the information he had received from Blevins.  Smith told appellant that based on the information he had received from Blevins and Akins, he believed he could obtain a warrant

to search appellant's home. Appellant then admitted that he had a firearm in the home, and he indicated that he did not want his parents' home "torn up" during a search. (Tr. Vol. 1 at 117.)

{¶ 12} Appellant elected to consent to a search of the home, executed a consent to search form at approximately 2:23 p.m., and gave Smith the key to the house. The form was co-signed by Smith and Special Agent James Ratterman of the Department of Homeland Security, another member of the HIDTA task force. Smith believed appellant signed the consent form because he was under the impression his parents' home would be torn up in the search if police were required to seek a warrant. Smith stated, however, "there was no threat of tearing anything up." (Tr. Vol. 1 at 152.)

{¶ 13} Appellant then rode back to his home in another officer's vehicle, followed by Smith, Ratterman, and McKee. When they arrived at appellant's home, Ratterman read appellant his *Miranda* rights while he and appellant were sitting in Ratterman's vehicle with Smith looking on from the opened passenger side window. *Miranda v. Arizona*, 384 U.S. 436 (1966). Appellant proceeded to execute a written waiver of his *Miranda* rights in the presence of both officers. He then told Smith that a firearm and cocaine could be found in the home. Appellant also told Smith that he purchased a kilogram of cocaine for $42,000 and that he had already sold half that kilogram for $21,000 or $22,000.

{¶ 14} Smith, Ratterman, and appellant waited outside as other officers searched the home. An initial search of the home uncovered a .45 caliber handgun under the mattress in appellant's bedroom, where appellant had told Smith it could be found. When the officers searching the home indicated they could not find the cocaine, appellant volunteered to show them where it was. Appellant then led officers to a planter in the hallway outside his bedroom. A plastic baggie containing an off-white powdery substance, later identified as one-half kilogram of cocaine, was found either under or inside the planter.

{¶ 15} On December 5, 2014, a Franklin County Grand Jury indicted appellant for possession of cocaine equal to or in excess of 100 grams, in violation of R.C. 2925.11, a felony of the first degree, and having a weapon while under disability, in violation of R.C. 2923.13, a felony of the third degree. The cocaine possession charge was accompanied by a one-year firearm specification under R.C. 2941.141(A) and a major drug offender

specification, pursuant to R.C. 2941.1410(A), which enhanced the degree of the cocaine possession charge to a first-degree felony.

{¶ 16} On February 12, 2015, appellant filed a motion to suppress both the physical evidence discovered in the search of his home and any statements appellant made to police as having been obtained in violation of appellant's constitutional rights under the Fourth and Fifth Amendments to the U.S. Constitution. The trial court conducted an evidentiary hearing on the motion on June 17, 2017, and on July 12, 2017, the trial court issued a decision denying the motion.

{¶ 17} The case proceeded to trial and plaintiff-appellee, State of Ohio, presented the testimony of Blevins, Smith, and McKee, as well as testimony of Hilliard Division of Police Sergeant Joshua Cohill and Hilliard Division of Police Lieutenant Douglas Lightfoot, who were members of the team that conducted the search of appellant's home.[1] Appellant took the stand and testified in his own defense. Appellant told the jury the cocaine and firearm had been planted at his home by Akins. A jury subsequently found appellant guilty of all charges, and the trial court sentenced appellant to an aggregate prison term of 15 years. Appellant timely appealed to this court from the judgment of the trial court.

## II.  ASSIGNMENTS OF ERROR

{¶ 18} Appellant assigns the following as trial court error:

> [1.] The Trial Court Erred in Overruling Sieng's Motion to Suppress.
>
> [2.] The verdict was supported by insufficient evidence.
>
> [3.] The verdict is against the manifest weight of the evidence.

## III.  LEGAL ANALYSIS

### A.  Appellant's First Assignment of Error

{¶ 19} In his first assignment of error, appellant contends the trial court erred when it denied his motion to suppress the physical evidence seized in the search of his home and the statements appellant made to police. We disagree.

---

[1] Appellee also presented the testimony of Michelle Anderson, a forensic scientist with the Ohio Bureau of Criminal Identification.

{¶ 20} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of fact finder and, accordingly, is in the best position to resolve factual questions and evaluate witness credibility." *Columbus v. Body*, 10th Dist. No. 11AP-609, 2012-Ohio-379, ¶ 9, citing *Burnside* at ¶ 8, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). "As such, an appellate court must accept the trial court's factual findings if they are supported by competent, credible evidence." *Body* at ¶ 9, citing *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). "However, after accepting those facts as true, an appellate court 'must independently determine, whether the facts satisfy the applicable legal standard, without giving any deference to the conclusion of the trial court.' " *State v. Drake*, 10th Dist. No. 16AP-258, 2017-Ohio-755, ¶ 12, quoting *State v. Holland*, 10th Dist. No. 13AP-790, 2014-Ohio-1964, ¶ 8, citing *Burnside* at ¶ 8.

{¶ 21} Appellant's first assignment of error is predicated, in large part, on his contention that McKee did not have legal grounds to justify the initial traffic stop. We disagree.

{¶ 22} " 'It is well-established that stopping an automobile, thus temporarily detaining its occupants, constitutes a seizure under the Fourth Amendment to the United States Constitution.' " *State v. Phillips*, 10th Dist. No. 14AP-79, 2014-Ohio-5162, ¶ 16, quoting *State v. Dorsey*, 10th Dist. No. 04AP-737, 2005-Ohio-2334, ¶ 17, citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). "Further, 'the seizure of a person without the authority of a warrant is per se unreasonable, and therefore unconstitutional, unless an exception applies.' " *Phillips* at ¶ 16, quoting *Dorsey* at ¶ 17, citing *Katz v. United States*, 389 U.S. 347, 357 (1967). " 'One such exception is commonly known as an investigative or *Terry* stop.' " *Phillips* at ¶ 16, quoting *Dorsey* at ¶ 17, citing *Terry v. Ohio*, 392 U.S. 1 (1968).

{¶ 23} " 'To legitimately effectuate a traffic stop [under *Terry*], an officer must have a reasonable and articulable suspicion of criminal activity.' " *State v. Bello-Mancilla*, 10th Dist. No. 16AP-787, 2017-Ohio-8003, ¶ 12, quoting *State v. Johnson*, 10th Dist. No. 16AP-689, 2017-Ohio-5527, ¶ 18. "Reasonable suspicion entails some minimal level of objective justification, 'that is, something more than an inchoate and unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause.' " *State v. Jones*,

188 Ohio App.3d 628, 2010-Ohio-2854, ¶ 17 (10th Dist.), quoting *State v. Jones*, 70 Ohio App.3d 554, 556-57 (2d Dist.1990), citing *Terry* at 27. *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, ¶ 7, quoting *State v. Freeman*, 64 Ohio St.2d 291 (1980), paragraph one of the syllabus.

{¶ 24} This court has previously held that observation of a traffic violation by an officer is sufficient to establish the reasonable and articulable suspicion required to stop a vehicle. *State v. McCandlish*, 10th Dist. No. 11AP-913, 2012-Ohio-3765, ¶ 10. *See also State v. Small*, 10th Dist. No. 17AP-551, 2018-Ohio-3943, ¶ 20, quoting *State v. Fasline*, 7th Dist. No. 12 MA 221, 2014-Ohio-1470, ¶ 19 ("A law enforcement officer has 'sufficient cause to conduct a traffic stop if the officer witnesses a violation of a traffic law.' "). The Supreme Court of Ohio has also determined that "[w]hen an officer observes a vehicle drifting back-and-forth across an edge line, the officer has a reasonable and articulable suspicion that the driver has violated R.C. 4511.33." *Mays* at ¶ 16. *See also State v. Comer*, 10th Dist. No. 13AP-955, 2014-Ohio-5755, ¶ 11. In *Dayton v. Erickson*, 76 Ohio St.3d 3 (1996), the Supreme Court found that an officer who saw the defendant fail to signal a turn had not merely reasonable, articulable suspicion but "clearly had probable cause to stop" the vehicle. *Id.* at 11.

{¶ 25} Here, the testimony admitted at the suppression hearing shows that McKee personally observed appellant fail to signal as he turned his vehicle eastbound on Feder Road from Hilliard-Rome Road. McKee testified at the suppression hearing as follows:

> Q. After you were finished with the traffic stop on Mr. Akins, did you have occasion to stop another car that day with regard to this same investigation?
>
> A. Yes, ma'am.
>
> Q. And how did that occur?
>
> A. Detective Clint Smith was also on the task force was telling us about where he observed violations on the subject. And then I -- when I finally caught up to him at Fisher, Hilliard-Rome and Feder Road, I observed him fail to signal.
>
> * * *
>
> Q. And I believe your testimony was that you did personally see [appellant] commit a traffic violation?
>
> A. I did.
>
> Q. And do you recall what that was?

A. Fail to signal when turned eastbound on Feder Road from Hilliard-Rome.

Q. And where, in fact, was he stopped?

A. The Marathon Gas Station there on the corner.

Q. Of?

A. Hilliard-Rome and Feder.

Q. Thank you. And prior to you personally witnessing a traffic violation, were you given information from Detective Clint Smith that he also had, in fact, witnessed a traffic violation?

A. Yes, I was. Several marked lanes and I believe fail to signal also.

(Tr. Vol. 1 at 68, 71-72.)

{¶ 26} McKee testified the traffic stop of appellant's vehicle was based on his personal observation of a traffic violation and the information he had previously received from Smith. On cross-examination, McKee admitted he did not document his observation of appellant's traffic violation in his K-9 use report. McKee also acknowledged that he did not cite appellant for a traffic violation.

{¶ 27} McKee's testimony at the suppression hearing, if believed, clearly established that a reasonable suspicion existed to stop appellant's vehicle for a traffic violation. While McKee's admissions on cross-examination may have provided the trial court with a basis to question McKee's credibility, the trial court's decision denying appellant's motion contains a finding that "Deputy McKee observed defendant commit a traffic violation[] and stopped his car." (July 12, 2017 Entry at 2.)

{¶ 28} As previously noted, "[w]hen considering a motion to suppress, the trial court assumes the role of fact finder and, accordingly, is in the best position to resolve factual questions and evaluate witness credibility." *Body* at ¶ 9, citing *Burnside* at ¶ 8, citing *Mills* at 366. The trial court obviously believed McKee's testimony that he personally observed appellant commit a traffic violation immediately prior to initiating the traffic stop. We cannot say McKee's failure to document his observations on his K-9 use report rendered his testimony unworthy of belief. Under *Terry*, and the above-cited Ohio case law interpreting the Fourth Amendment, the observation of a traffic violation by McKee

provided McKee with the reasonable suspicion required to make a traffic stop of appellant's vehicle. *Erickson*; *McCandlish*.

{¶ 29} Appellant next contends any statements appellant made to Smith about the firearm at his home should have been excluded from evidence as being obtained in violation of appellant's Fifth Amendment rights because appellant had not been informed of his *Miranda* rights prior to the interrogation. In *Miranda*, the United States Supreme Court recognized certain procedural safeguards for securing the privilege against self-incrimination guaranteed by the Fifth Amendment to the U.S. Constitution and Article I, Section 10 of the Ohio Constitution. *Cleveland v. Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, ¶ 8, citing *Malloy v. Hogan*, 378 U.S. 1, 3 (1964). "What are now commonly known as *Miranda* warnings are intended to protect a suspect from the coercive pressure present *during a custodial interrogation*." (Emphasis added.) *Oles* at ¶ 9, citing *Miranda* at 469. "A custodial interrogation is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *Oles* at ¶ 9, quoting *Miranda* at 444. "If a suspect provides responses while in custody without having first been informed of his or her *Miranda* rights, the responses may not be admitted at trial as evidence of guilt." *Oles* at ¶ 9, citing *Miranda* at 479.

{¶ 30} Appellant's primary argument for excluding statements appellant made to Smith is his claim that the initial traffic stop was not supported by a reasonable suspicion that appellant had committed a traffic violation. However, as we have determined, the evidence supports the trial court's conclusion that McKee lawfully stopped appellant's vehicle for a traffic violation. In *Berkemer v. McCarty*, 468 U.S. 420 (1984), the United States Supreme Court "recognized that although a traffic stop 'significantly curtails the "freedom of action" of the driver and passengers, if any, of the detained vehicle,' the stop alone does not render a suspect 'in custody' and therefore does not trigger the need for *Miranda* warnings." *Oles* at ¶ 11, quoting *Berkemer* at 436, 440.

{¶ 31} The Supreme Court of Ohio in *Oles* determined that a traffic stop becomes a custodial interrogation when, under the totality of the circumstances, a reasonable person in defendant's position would have understood himself to be in custody. *Id.* at ¶ 13, citing *Berkemer* at 442. In *Oles*, a trooper asked defendant to sit in the front seat of his patrol car

during a lawful traffic stop, but the trooper did not perform a pat-down search or place defendant in handcuffs. The officer's subsequent questioning and detention of defendant in the patrol car was short in duration, and the interaction between defendant and the trooper was nonthreatening and nonintimidating. The Supreme Court held that under such circumstances, a reasonable person in defendant's position would not have understood himself to be in custody. *Id.* at ¶ 31.

{¶ 32} Here, the trial court found appellant "was not in custody" at the time he made certain statements to Smith regarding the presence of a firearm at his residence. (July 12, 2017 Entry at 4.) The evidence supports the trial court's finding. On cross-examination, Smith described his encounter with appellant during the traffic stop as follows:

> Q. Now, when you approached [appellant] at the scene of the traffic stop, what was the nature of his custody status?
>
> A. He was just standing outside the vehicle while Deputy McKee ran his dog around the vehicle.
>
> Q. And was he under detention?
>
> A. I mean, he wasn't free to leave at that very moment. Deputy McKee was still in the process of conducting his initial traffic stop and I just engaged in a conversation.
>
> Q. Well, even after Deputy McKee was done with his business he was not free to leave, correct?
>
> A. Well, he was advised he could leave. I said, we're pretty much done here unless you want to tell me what's going on at your house. And then --
>
> Q. So he could have just declined and you would have let him go?
>
> A. I felt at this point I had enough to probably justify writing a search warrant for the residence. I had him positively ID'd. I could file a warrant on him at a later time. So if he wanted to depart at that time I probably would have let him go.

(Tr. Vol. 1 at 147-48.)

{¶ 33} The totality of the circumstances in this case would not have led a reasonable person in appellant's position to believe he was in custody at the time Smith engaged him in conversation and ultimately obtained appellant's admission that he had a firearm at his home. The evidence shows appellant was standing outside his vehicle when Smith

approached him, and the lawful traffic stop was still underway at that time.[2]  Appellant was not handcuffed or restrained in any way, nor was appellant placed in a police vehicle.  Smith asked appellant where he was coming from and then confronted appellant with the information he had learned from Blevins.  When the traffic stop was completed, Smith told appellant "we're pretty much done here unless you want to tell me what's going on at your house."  (Tr. Vol. 1 at 147.)  Smith also offered his opinion that he had gathered sufficient facts to obtain a search warrant for the home.  Appellant subsequently informed Smith that he had a firearm at his home.  Appellant orally consented to a search of his home and then signed a consent form.

{¶ 34}  The evidence submitted at the suppression hearing does not reveal any intimidating or threatening behavior on Smith's part that would have given appellant the impression that he was not free to leave once the traffic stop had been completed.  To the contrary, appellant was advised he could leave once the traffic stop had concluded.  In our view, the evidence submitted at the suppression hearing supports the trial court's conclusion that appellant was not in custody either when he made statements to Smith about the firearm or when he consented to the search of his parents' home.  Thus, *Miranda* warnings were not required at that time.  *Berkemer*; *Oles*.

{¶ 35}  Appellant also contends that his consent to a search was coerced by Smith's alleged threat to tear up his parents' home if he was required to obtain a warrant.  Though Smith testified he told appellant he had sufficient information to obtain a warrant if appellant did not consent to a search, he denied making any such threat.

{¶ 36}  The question of whether consent to a search was voluntary or the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances.  *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 99, citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).  The standard for measuring the scope of consent under the Fourth Amendment is objective reasonableness, i.e., what a typical reasonable person would have understood by the exchange between the officer and

---

[2] "In diligently pursuing the purpose of a traffic stop, police officers 'also may engage in other investigative techniques unrelated to the underlying traffic infraction or the safety of the officers.' "  *Small*, 2018-Ohio-3943, at ¶ 21, quoting *United States v. Hill*, 852 F.3d 377, 382 (4th Cir.2017), citing *Rodriguez v. United States*, ___ U.S. ___, 135 S.Ct. 1609, 1614-15 (2015).  "The officer 'may also ask the driver and passengers about matters unrelated to the traffic stop itself, so long as those questions do not measurably extend the duration of the stop.' "  *Small* at ¶ 21, quoting *Rodriguez* at 1615.

the suspect. *Roberts* at ¶ 99, citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Where a police officer "does not falsely claim possession of a search warrant, but rather candidly informs a person why a search is needed, either with his consent or with a search warrant, and the person clearly understood that he had a constitutional right to withhold consent, a finding of voluntariness is appropriate." *State v. Clelland*, 83 Ohio App.3d 474 (4th Dist.1992), citing *State v. Danby*, 11 Ohio App.3d 38 (6th Dist.1983).[3]

{¶ 37} In this instance, the information gathered by the HIDTA task force during the surveillance of appellant's home, the canine alerting to the trunk of appellant's vehicle, and the statements made by Akins regarding the presence of a firearm and cocaine in appellant's home arguably provided Smith with sufficient facts to obtain a search warrant based on probable cause. There is also no evidence that appellant was told he could not refuse consent. Under the circumstances, Smith's statement to appellant he had sufficient information to obtain a warrant cannot be considered coercive in nature. *Clelland*; *Danby*. Additionally, appellant signed a form entitled "Consent to Search Without A Warrant," which provides in relevant part:

> I, [appellant], have been informed of my constitutional right not to have a search made of my premises * * * without a search warrant. No promises, threats, duress, or coercion have been made to me or against me. Having been informed of my right to refuse to consent to such a search, and understanding that evidence and/or contraband found as a result of such may be seized and used against me in a court of law.

(State's Ex. MH-1 at 1, filed Jan. 17, 2018.)

{¶ 38} The voluntariness of a consent is a question of fact that depends on the totality of the circumstances. *Roberts* at ¶ 99; *Schneckloth* at 227. *See also State v. Childress*, 4 Ohio St.3d 217 (1983), paragraph one of the syllabus. The government bears the burden of proving consent to the search by clear and positive evidence. *Danby* at 41. *See also Florida v. Royer*, 460 U.S. 491, 497 (1983). The trial court determined appellant voluntarily consented to the search of his parents' home. An appellate court will not reverse a trial court's determination that consent was voluntary unless that determination is clearly

---

[3] In *State v. Lattimore*, 10th Dist. No. 03AP-467, 2003-Ohio-6829, this court stated that coercion is not demonstrated merely because a suspect is being temporarily detained for the traffic violation or formally detained at the time of consent. *Id.* at ¶ 17, citing *United States v. Watson*, 423 U.S. 411, 424 (1976).

erroneous.  *State v. Limoli*, 10th Dist. No. 11AP-924, 2012-Ohio-4502, ¶ 36; *State v. Hassey*, 9 Ohio App.3d 231, 237 (10th Dist.1983); *Lattimore* at ¶ 9.  On this record, we cannot say the trial court erred when it found appellant's consent was voluntarily given.

{¶ 39} For the foregoing reasons, appellant's first assignment of error is overruled.

**B.  Appellant's Second Assignment of Error**

{¶ 40} In appellant's second assignment of error, appellant contends that his convictions were not supported by sufficient evidence.  We disagree.

{¶ 41} "Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict."  *State v. Kurtz*, 10th Dist. No. 17AP-382, 2018-Ohio-3942, ¶ 15, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  Whether the evidence is legally sufficient to support a verdict is a question of law, not fact.  *Id.*  In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' "  *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact."  *State v. Patterson*, 10th Dist. No. 15AP-1117, 2016-Ohio-7130, ¶ 32, citing *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 42} "In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction."  *Kurtz* at ¶ 16, citing *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). "Further, 'the testimony of one witness, if believed by the jury, is enough to support a conviction.' "  *Patterson* at ¶ 33, quoting *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42.  *See also State v. Clark*, 10th Dist. No. 15AP-926, 2016-Ohio-5493, ¶ 25.

{¶ 43} R.C. 2925.11(A) prohibits any person from knowingly obtaining, possessing, or using a controlled substance. R.C. 2925.01(K) defines "[p]ossess" or "possession" as "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found."

{¶ 44} The offense of having a weapon while under disability is defined by R.C. 2923.13, in relevant part, as follows:

> (A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:
>
> * * *
>
> (3) The person is under indictment for or has been convicted of any felony offense involving the illegal possession * * * in any drug of abuse.

{¶ 45} Appellant's sufficiency argument does not challenge appellee's evidence that cocaine and an operable firearm were recovered in the search of his home. Nor does he contend that the quantity of cocaine found in the search of his home was insufficient to satisfy the major drug offender specification. Appellant also concedes he has a disqualifying conviction for purposes of having a weapon while under disability.

{¶ 46} In making his argument that appellee presented insufficient evidence to support his conviction of cocaine possession, beyond a reasonable doubt, appellant claims that "[t]he only evidence connecting [appellant] to the cocaine is proximity." (Appellant's Brief at 16.) Appellant contends that under Ohio law, the mere proximity of appellant to the cocaine found in his home, standing alone, is insufficient to establish constructive possession. Though we agree generally with appellant's proposition of law, appellant's sufficiency argument completely overlooks the trial testimony from Smith and Cohill. During his direct examination, Smith recalled the conversation he and Ratterman had with appellant just after appellant executed a waiver of his *Miranda* rights and during the search of appellant's home. Smith testified as follows:

> Q. * * * Now, after reading the defendant his rights, did he speak with you?

A. Yeah. We had a fairly pleasant conversation. He discussed the fact that he was concerned about his parents finding out due to the fact he lived in their residence and that he had bought a kilo of cocaine for $42,000.

Q. I'm sorry, how much?

A. $42,000.

Q. Okay.

A. He had sold half of it. He still owed about $21,000, if I'm correct on that number. And then we referenced the gun. I asked him about the gun and he said the gun is in his bedroom underneath his mattress. And we talked about the fact that he's a registered felon and cannot possess a firearm. And he, again, reiterated the fact that he didn't want to be in any trouble and he had gotten the gun from a young male white that he knew as Mike for $500. And he believed it may be stolen but wasn't sure.

Q. Did he talk about how much, that if he sold cocaine and how much?

A. He did. He mentioned the fact that he sold it usually by the ounce. He never sold smaller than that, and went about $1,400 an ounce.

Q. Did you have any discussions that you remember, sir, about his parents' bedroom and if he had anything in his parents' bedroom?

A. Yes. He said that there might be some of the money, the proceeds from the previous half key that had been sold, half kilogram. So he said he had that -- I'm trying to remember the number -- maybe 21, $22,000. He wasn't sure how much of it was left, but some of it might be in their room and that he'd given his parents some for vacation and some other sundries.

 (Tr. Vol. 2 at 62-64.)

{¶ 47} Smith also testified that when the officers searching appellant's home could not immediately find the cocaine, appellant went into the home and guided officers to the planter in the hallway outside his bedroom where officers found the plastic bag containing cocaine. Cohill testified that when he also found bottles containing lidocaine during the search of appellant's home and asked appellant what he used them for, appellant told him that he "used [it] to cut cocaine." (Tr. Vol. 2 at 234.)

{¶ 48} In *Phillips*, 2014-Ohio-5162, this court addressed the concept of constructive possession for purposes of a conviction for cocaine possession as follows:

> " 'Possession of a controlled substance may be actual or constructive.' " *State v. Saunders*, 10th Dist. No. 13AP-668, 2014-Ohio-1746, ¶ 18, quoting *State v. Pilgrim*, 184 Ohio App. 3d 675, 2009-Ohio-5357, ¶ 27, 922 N.E.2d 248 (10th Dist.). " 'A person has actual possession of an item when it is within his immediate physical control.' " *Id.*, quoting *Pilgrim* at ¶ 27. " 'Constructive possession exists when a person knowingly exercises dominion and control of an object, even though the object may not be within the person's immediate physical possession.' " *Id.*, quoting *Pilgrim* at ¶ 27. " '[T]he surrounding facts and circumstances, including the defendant's actions, constitute evidence from which the trier of fact can infer whether the defendant had constructive possession over the subject drugs.' " *Id.*, quoting *Pilgrim* at ¶ 28, citing *State v. Stanley*, 10th Dist. No. 06AP-323, 2007-Ohio-2786, ¶ 31. Inherent in a finding of constructive possession is the determination that a defendant had knowledge of the items purportedly possessed. *State v. Alexander*, 8th Dist. No. 90509, 2009-Ohio-597, ¶ 24.

*Id.* at ¶ 116.

{¶ 49} There is no doubt the testimony of Smith and Cohill, if believed, is sufficient to support appellant's conviction of cocaine possession beyond a reasonable doubt. Appellant's statements to these officers, if believed, establishes appellant's constructive possession of the cocaine found in the hallway just outside his bedroom. *See State v. Walker*, 10th Dist. No. 14AP-905, 2016-Ohio-3185 (sufficient evidence supported defendant's conviction for possession of cocaine with a firearm specification, under R.C. 2925.11(A) and 2941.141(A), based on constructive possession because the evidence showed defendant resided at the apartment and had knowledge of, as well as dominion and control over, the drugs and weapon located in the dresser drawer of the northeast bedroom). Though appellant denied making the statements attributed to him by Smith and Cohill and testified at trial that the cocaine found in the search of his home was planted by Akins, in ruling on a challenge to the sufficiency of the evidence, this court is required to construe the evidence in appellee's favor. Accordingly, we hold that the conviction for cocaine possession was supported by sufficient evidence.

{¶ 50} With regard to the conviction of having a weapon while under disability ("WUD"), appellee's evidence established that appellant told Smith he had a firearm underneath the mattress in his bedroom and that he had purchased the handgun for $500 from a friend by the name of Mike. Appellant also acknowledged that as a felon, he was prohibited from possessing a firearm. Police subsequently found the handgun in the location appellant had indicated. Such evidence is clearly sufficient to satisfy the elements of R.C. 2923.13.

{¶ 51} Appellant contends, however, that his testimony at trial that Akins planted the weapon in his bedroom was more believable than appellee's evidence. However, such an argument challenges the weight and credibility of the evidence, not the sufficiency of the evidence. This court has held that when appellant's sufficiency of the evidence argument raises an issue of witness credibility, we will address the argument in or analysis of the manifest weight of the evidence. *Bankston*, 2009-Ohio-754, at ¶ 4; *State v. Harris*, 10th Dist. No. 17AP-350, 2018-Ohio-3872, ¶ 27; *State v. Connally*, 10th Dist. No. 16AP-53, 2016-Ohio-7573, ¶ 37-38. Accordingly, we shall address appellant's argument in connection with our ruling in appellant's third assignment of error.

{¶ 52} Similarly, appellant's claim that the WUD conviction is not supported by sufficient evidence because appellee failed to produce fingerprint or DNA evidence connecting appellant to the gun also resolves to an issue of credibility. The evidence shows appellee chose not to test the firearm recovered from under appellant's mattress to determine the presence of appellant's fingerprints or DNA. When Lightfoot was asked to explain why fingerprint or DNA analysis was not requested for the bag of cocaine and the firearm, the following exchange took place:

> Q. Okay. The only way to find out whether your suspect's DNA or fingerprint is on an item is by ordering the testing, right?
>
> A. That would be correct.
>
> Q. And you stated that this was unnecessary because [appellant] admitted ownership, right?
>
> A. In my opinion, yes, sir.
>
> Q. And these alleged admissions were not recorded in any manner, correct?
>
> A. Not that I'm aware of. I did not record them.

Q. Would you agree it would be good practice, even with an admission, to request this type of testing in order to corroborate the admission?

A. He knew where it was. He admitted ownership.

Q. Please answer my question.

A. The answer is no. He admitted -- and the reason why is because he admitted it was his and he knew where it was.

Q. So no need to bother with other testing?

A. I don't see a reason to, sir.

(Tr. Vol. 2 at 201-02.)

{¶ 53} In our view, the testimony of Smith and Cohill, if believed, was clearly sufficient to establish appellant's constructive possession of the firearm, even in the absence of corroborating fingerprint or DNA evidence. *Walker*. The fact that appellee elected not to order such testing does not alter the fact that appellant admitted to the officers that he owned the firearm found under his mattress. Whether appellant's testimony or that of the officers was more believable is a matter of witness credibility, which is not the subject of this court's sufficiency analysis. *Bankston*; *Connally*.

{¶ 54} Finally, with regard to the firearm specification, R.C. 2941.141(A) requires imposition of a one-year mandatory prison term on an offender when the offender "had a firearm on or about the offender's person or under the offender's control while committing the offense." "Generally, '[o]n or about his person or under his control,' or actual possession 'means that "the firearm was either carried on the defendant's person or was so near the defendant's person as to be conveniently accessible and within his immediate physical reach." ' " *State v. Carson*, 8th Dist. No. 104998, 2017-Ohio-7243, ¶ 15, quoting *State v. Smith*, 8th Dist. No. 93593, 2010-Ohio-4006, ¶ 11, quoting 2 *Ohio Jury Instructions*, CR Section 4 at 127 (2008). "Thus, 'all that is necessary is that the defendant have the firearm on or about his person or under his control "*at some point*" during the crime's commission.' " (Emphasis sic.) *Walker* at ¶ 64, quoting *State v. Harry*, 12th Dist. No. CA2008-01-013, 2008-Ohio-6380, ¶ 53.

{¶ 55} Smith testified that appellant admitted ownership of the cocaine and the firearm and police found the cocaine hidden under a planter in the hallway outside appellant's bedroom where police had found the firearm. Blevins testified appellant was in

the home alone just prior to the time appellant left to pick up Akins. Thus, appellee produced sufficient evidence to support appellant's conviction of the firearm specification. *See State v. Brown*, 107 Ohio App.3d 194 (3d Dist.1995) (weapon found in bedroom, while defendant was in living room, was under defendant's control); *Walker* at ¶ 74 (evidence sufficient to establish defendant's guilt of a firearm specification where the gun and drugs were found in the same bedroom dresser drawer in the apartment leased by defendant).

{¶ 56} For the foregoing reasons, appellant's second assignment of error is overruled.

### C. Appellant's Third Assignment of Error

{¶ 57} In appellant's third assignment of error, appellant contends that his convictions were against the manifest weight of the evidence. We disagree.

{¶ 58} "In considering a defendant's claim that a jury verdict is against the manifest weight of the evidence, '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Williams*, 10th Dist. No. 10AP-779, 2011-Ohio-4760, ¶ 20, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "Further, '[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Williams* at ¶ 20, quoting *Martin* at 175.

{¶ 59} "Unlike the standard of review for sufficiency of the evidence, 'a reviewing court does not construe the evidence most strongly in favor of the prosecution when using a manifest-weight standard of review.' " *Williams* at ¶ 21, quoting *State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, ¶ 81 (2d Dist.). A manifest weight of the evidence challenge " 'questions the believability of the evidence and asks a reviewing court to determine which of the competing inferences is more believable.' [*Woullard* at ¶ 81.] However, an appellate court 'may not substitute its judgment for that of the trier of fact on the issue of the credibility of the witnesses unless it is patently apparent that the factfinder lost its way.' " *Williams* at ¶ 21, quoting *Woullard* at ¶ 81.

{¶ 60} Having determined that the evidence presented by appellee, if believed, was sufficient to convict appellant of cocaine possession beyond a reasonable doubt, the

manifest weight analysis requires this court to determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Appellant's manifest weight argument is that his own testimony at trial was more believable than the evidence presented by appellee.

{¶ 61} At trial, appellant testified about the events that led to his arrest. According to appellant, he called 911 on three occasions on the morning of July 10, 2014 because his girlfriend, Jasmine Rodgers, continued to let unidentified individuals into the residence, including a black male with a gym bag who ran in appellant's front door and out the back door. Appellant also recalled hearing someone using his kitchen sink while he and Rodgers were at the back door. Appellant denied that he or Rodgers was under the influence of drugs.

{¶ 62} Appellant testified that after Rodgers was taken away by paramedics, his friend Akins stopped by and asked appellant to step outside with him while he smoked a "Black & Mild." (Tr. Vol. 4 at 572.) Akins proceeded to ask appellant about the earlier police visits. According to appellant, while he and Akins were conversing, appellant observed a vehicle drive slowly by Akins' vehicle while the passenger appeared to jot down the license plate number. When appellant asked Akins about this, Akins said it was nothing to worry about.

{¶ 63} Akins then followed appellant as he walked through the house to the back yard to tend to his dog. According to appellant, Akins then asked to use the restroom and insisted on using the upstairs bathroom instead of the downstairs bathroom. Akins then left appellant's home and drove away.

{¶ 64} Appellant testified that when he next went upstairs, he noticed a white plastic bag in the flower pot outside his bedroom and a "metal thing" sticking out from under the sheets of his bed. (Tr. Vol. 4 at 575.) Appellant testified that "[i]t looked like the back of a handgun." (Tr. Vol. 4 at 575.) According to appellant, Akins then called him on the telephone and asked for a ride because he had been pulled over by police.

{¶ 65} On his way to pick up Akins, appellant was pulled over by McKee. Appellant recalled that Smith arrived during the traffic stop and told appellant that Blevins had just

seen him put something in the trunk of the Acura. Appellant denied putting anything in the trunk of the Acura and made the following statement to Smith:

> I was like -- come here, sir. * * * I'm like, where's Akins at, man. He just called me and said he's pulled over by the police. I know you guys know where he's at. Where he at? And he was like, what's going on? Because he just put something in my house, man. Where's he at? Where is he at? He's like calm down, calm down. He put what in your house? I seen something white in the flower plant and I seen a gun that's sticking outside my bed.

(Tr. Vol. 4 at 577-78.)

{¶ 66} According to appellant, he requested that Smith immediately return to the house with him, but Smith informed him he first needed appellant to sign a consent form. Appellant testified that he signed the form and that he was transported by another officer back to his home where the search took place. Appellant stated he remained outside while the search took place, and he denied telling Smith that he had purchased the drugs or speaking with any Hilliard police officer. According to appellant, when Smith showed him the plastic bag of cocaine found in the house, he told Smith it was planted by Akins. Appellant testified that Akins was motivated to set him up because Akins was on probation after being caught with 600 pounds of marijuana.

{¶ 67} Appellant argues that his own trial testimony was more believable than that of appellee's witness and that his testimony presented the jury with a "plaus[i]ble" theory of innocence. (Appellant's Brief at 21.) Accordingly, appellant maintains his convictions are against the manifest weight of the evidence.

{¶ 68} "In conducting a manifest weight of the evidence review [an appellate court] may consider the credibility of the witnesses." *Kurtz*, 2018-Ohio-3942, at ¶ 18, citing *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. "Though appellate courts must sit as a 'thirteenth juror' when considering a manifest weight argument, it must also give great deference to the trier of fact's determination on the credibility of the witnesses." *Kurtz* at ¶ 31, citing *State v. Favor*, 10th Dist. No. 08AP-215, 2008-Ohio-5371, ¶ 10, citing *State v. Covington*, 10th Dist. No. 02AP-245, 2002-Ohio-7037. The trier of fact is in the best position to take into account the inconsistencies in the evidence, as well as the demeanor

and manner of the witnesses, and to determine which witnesses are more credible. *State v. Williams*, 10th Dist. No. 02AP-35, 2002-Ohio-4503, ¶ 58.

{¶ 69} "The trier of fact is free to believe or disbelieve any or all of the testimony presented." *Kurtz* at ¶ 31, citing *State v. Jackson*, 10th Dist. No. 06AP-1267, 2008-Ohio-1277, ¶ 11. Accordingly, "[a] defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was offered at trial." *Favor* at ¶ 10, citing *State v. Campbell*, 10th Dist. No. 07AP-1001, 2008-Ohio-4831. "Neither is a conviction against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version." *State v. Rankin*, 10th Dist. No. 10AP-1118, 2011-Ohio-5131, ¶ 29, citing *State v. Gale*, 10th Dist. No. 05AP-708, 2006-Ohio-1523, ¶ 19; *State v. Williams*, 10th Dist. No. 08AP-719, 2009-Ohio-3237, ¶ 17. "Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, *appeal not allowed*, 140 Ohio St.3d 1455, 2014-Ohio-4414, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

{¶ 70} Though we agree that appellant's testimony presented the jury with a conceivable theory of innocence, the jury was not required to believe appellant's testimony. The jury was free to consider the conflicting evidence and make threshold determinations as to weight and credibility. Our independent review of the evidence in this case, including the testimony of appellant and his witnesses, convinces us that the jury did not lose its way and create a manifest injustice in finding appellant guilty of all the charges in the indictment. Accordingly, we hold appellant's convictions were supported by sufficient evidence and not against the manifest weight of the evidence. Appellant's third assignment of error is overruled.

## IV. CONCLUSION

{¶ 71} Having overruled appellant's three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

TYACK and KLATT, JJ., concur.

_____